In the Matter of the Application of
**DIAMOND D CONSTRUCTION
CORP., Respondent–Petitioner,**

v.

**For a Judgment Staying the Arbitration
Commenced by**

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNIONS NO. 17, 17A, 17B, 17C, and 17R; Thomas G. Hopkins, as President and Business Manager of the International Union of Operating Engineers, Local Unions No.**

17, 17A, 17B, 17C, and 17R; Gerald A. Thompson, As Treasurer and Business Representative of the International Union of Operating Engineers, Local Unions No. 17, 17A, 17B, 17C, and 17R, Petitioner–Respondents.

No. 95–CV–940C(F).

United States District Court, W.D. New York.

May 31, 1998.

Napier, Fitzgerald & Kirby, Brian P. Fitzgerald, of counsel, Buffalo, NY, for respondent-petitioner.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP, Mark G. Pearce, of counsel, Buffalo, NY, for petitioner-respondents,

## DECISION and ORDER

CURTIN, District Judge.

### *BACKGROUND*

Currently pending are the parties' cross-motions for summary judgment (Items 21 and 24).[1] Respondent–Petitioner Diamond "D" Construction Corp. ("Diamond 'D' ") has moved for summary judgment, permanently staying the arbitration sought by Petitioner–Respondents International Union of Operating Engineers, AFL–CIO, Local Unions No. 17, 17A, 17B, 17C, and 17R; Thomas G. Hopkins, as President and Business Manager; and Gerald A. Thompson, as Treasurer and Business Representative (hereinafter referred to collectively as "Local 17"), and denying Local 17's counterclaim to compel arbitration. In the alternative, Diamond "D" seeks an order directing and declaring that the arbitration sought by Local 17 be limited

---

1. Items 24 and 26 are duplicates of the same motion. On May 5, 1998, this court dismissed Item 26 as duplicative (Item 40).

to disputes or grievances arising during the time period of September 12, 1991, through September 16, 1991 (Item 21). Local 17 has moved for summary judgment granting Local 17's counterclaim to compel arbitration and dismissing Diamond "D"'s petition to stay arbitration (Item 24). The parties appeared for argument on these motions on January 16, 1998.

Although the present action is relatively new, the parties have been litigating the underlying dispute in federal court since December 1991. Local 17 initially filed an action before the Honorable Richard J. Arcara to compel arbitration of Local 17's grievance that Diamond "D" had violated the collective bargaining agreement ("CBA") by using non-union workers, failing to use apprentices on backhoes, and failing to use operators on compressors and pumps (91–CV–844A(F)). Diamond "D" raised two affirmative defenses to Local 17's complaint in its answer, one substantive defense and one challenging the court's personal jurisdiction because of inadequate service of process. After over three and one-half years' litigation, Local 17 sought a voluntary dismissal of the action, without prejudice, pursuant to Fed.R.Civ.P. 41(a)(2), in order to allow it the opportunity to place the underlying dispute before a joint committee of labor and management pursuant to the terms of the CBA, thereby meeting the conditions precedent to a demand for arbitration. On July 12, 1995, Magistrate Judge Leslie G. Foschio granted Local 17's motion. Thereafter, Local 17 attempted to take the necessary steps to bring its grievance to arbitration. On October 16, 1995, Diamond "D" filed a petition in State Court to stay the arbitration. On October 30, 1995, Local 17 removed Diamond "D"'s petition to federal court. The removed action is the action presently before this court.

Because many of the issues raised in the pending motions involve questions regarding the factual background of the dispute and the procedural background of the first action, it is necessary to conduct a detailed account of exactly what has happened since the dispute first arose.

## I. The Parties, the CBA, and the Underlying Dispute

Diamond "D" is a highway and streets construction contractor located in Depew, New York. Local 17 represents some of Diamond "D"'s employees. Local 17 has been a party to a series of CBAs with the Labor Relations Division, Western New York Region, Associated General Contractors of America, New York Chapter, Inc. ("AGC") for a number of years (Item 21, Fitzgerald affidavit, ¶ 3; Item 24, Pearce affidavit, ¶ 3). Although Diamond "D" is not a member of the AGC, Diamond "D" has been a signatory to the Local 17–AGC CBA at various times from the late 1970s through January 20, 1993, and has employed members of Local 17, as is often the custom of contractors that are not part of a contractors' association (Item 29, ¶ 2; Item 31, p. 9; Item 35, p. 22).

On or about July 28, 1991, Joseph DiPizio, President of Diamond "D", signed the 1990–93 Local 17–AGC CBA (Item 21, Fitzgerald affidavit, ¶ 3; Item 29, ¶ 3).[2] Article IV of the CBA, entitled "Grievance Procedure and Arbitration," set forth precisely how disputes involving all violations other than those concerning wages, hours, or fringe benefit contributions were to be handled. Article IV provided, in relevant part, as follows:

2. All grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observation of any provisions of this Agreement shall be handled pursuant to the following procedure:

(a) The subject matter of the dispute shall be discussed and, if possible, resolved on the job site in a meeting of the Union Representative and the Employer's Superintendent within four (4) working days of the action complained of.

(b) If the matter is not satisfactorily resolved pursuant to 2(a), there shall be a meeting of the Union's Business Manager and the Associated General Contractors

---

**2.** Local 17 has argued that Diamond "D" signed on to the CBA on May 28, 1991 (Item 24, Pearce affidavit, ¶ 3 and Exhibit A). Local 17's copy of the CBA is signed by DiPizio and dated May 28, 1991. The exact date is not material to the underlying dispute.

representative within six (6) working days of the action complained of.

(c) If the matter is still not satisfactorily resolved pursuant to 2(b), a committee of Union and Association representatives will hear the complaint in the presence of the Employer and the Union. (Non–LRD Employers will be charged a service fee of five hundred dollars ($500) to cover the cost of this meeting).

(d) Should the committee be unable to adjust the grievance satisfactorily pursuant to 2(c), then the matter may be submitted to arbitration upon request of the aggrieved party within two (2) weeks.

(e) The arbitrator will be selected from a panel of five (5) impartial arbitrators submitted by the New York State Mediation Board.

(f) The expenses and fees of the Arbitrator shall be borne equally by the Employer and the Union. The Arbitrator shall not have the power to add to, subtract from or modify the provisions of this agreement. No Employee shall have the right to institute any action, arbitration or proceeding under this agreement.

(g) In all cases, the status quo will be observed pending resolution of the dispute. (Item 21, Exhibit A; Item 24, Exhibit A).

According to DiPizio, during the years prior to September 1991, various representatives of Local 17 visited Diamond "D" job sites at County Road 12, Como Park Boulevard, and William Street, including the day he signed the CBA, and they never offered any complaints or raised any disputes or grievances (Item 29, ¶ 4). Diamond "D"'s operations at these sites could have been observed by any passerby, including representatives of Local 17, yet no complaints or grievances were ever brought to DiPizio's attention (*Id.*). Leo M. Hopkins, the son of Leo A. Hopkins, Local 17's Business Manager at the time DiPizio signed the CBA, is married to DiPizio's daughter and has worked for Diamond "D" for a number of years. DiPizio attests that throughout those years, Local 17 never offered any complaints or brought any disputes or grievances to his attention (*Id.,* ¶ 5).

By letter dated September 16, 1991, Thomas G. Hopkins, President and Business representative of Local 17, advised DiPizio that Diamond "D" was in violation of the CBA by (1) using workers who are not members of Local 17 to operate machinery on its job sites, (2) failing to use apprentices on backhoes, and (3) having no operators on compressors and pumps (Item 21, Exhibit B; Item 24, Pearce affidavit, ¶ 5). Hopkins requested a meeting with DiPizio to settle the grievance, and explained that if he failed to respond in an appropriate time frame, Hopkins would assume that Diamond "D" wished to proceed to step 2(c) of the CBA grievance procedure (Item 21, Exhibit B; Item 24, Pearce affidavit, ¶ 5). The letter did not provide any information regarding the particular job sites at issue or the exact dates of the alleged violations. The letter was sent by certified mail, return receipt requested; however, it was returned to Local 17 marked "unclaimed" (Item 21, Exhibit B; Item 24, Pearce affidavit, ¶ 5).

At oral argument, Local 17's attorney, Mark G. Pearce, Esq.,[3] stated that an affidavit supplied by Thomas Hopkins explains that upon learning that the CBA was not being complied with, he went to seek out DiPizio at the job site, attempted to contact him by telephone on several occasions, and only after these unsuccessful attempts at complying with paragraph 2(a) of the grievance procedure did he send the September 24, 1991, letter (Item 35, p. 24). Although the record does not contain an affidavit prepared by Thomas Hopkins, Hopkins prepared Local 17's answers and objections to Diamond "D"'s first set of interrogatories, and in these responses he makes the claims Pearce described (Item 32, Exhibit B, p. 4). In his memorandum of law submitted in response to Diamond "D"'s summary judgment motion and in support of Local 17's summary judgment motion, Pearce states

---

3. Mark Pearce, who represents Local 17 in this second action, is a member of the law firm Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP ("Lipsitz, Green"). Richard Lipsitz, Esq., who represented Local 17 in the first action, is also a member of Lipsitz, Green. Thus, Local 17 has been represented by the same firm throughout both actions.

that at some time "[d]uring the first two weeks of September 1991, commencing within four days of the action complained of, Thomas Hopkins attempted to contact Joseph DiPizio, representative of Diamond "D" by telephone calls that were unreturned and personal visits to DiPizio's known work site[,] without success." (Item 25, p. 3).

Paragraph 2(b) of the grievance procedure requires a meeting of the union's business manager and the AGC representative within six working days of the action complained of. Such a meeting does not require any cooperation of the employer. Local 17 has never explained why it did not hold such a meeting.

By letter dated October 24, 1991, hand-delivered on October 28, 1991, Local 17's counsel, Richard Lipsitz, advised Diamond "D" that pursuant to the CBA, Local 17 was giving notice of its intention to arbitrate the issues as specified in the September 16, 1991, letter, and that unless Diamond "D" applied to stay the arbitration within twenty days, Diamond "D" would thereafter be precluded from arguing that a valid agreement to arbitrate existed or had not been complied with and from asserting in court the bar of a limitation of time (Item 21, Exhibit C; Item 24, Pearce affidavit, ¶ 6). According to Diamond "D", at the time this letter was sent, there had not been a meeting at the job site to discuss the alleged violations of the CBA, nor any other proceedings in accordance with the conditions precedent of the grievance procedure (Item 21, Fitzgerald affidavit, ¶ 6). Diamond "D" did not respond to this letter, did not participate in any grievance arbitration procedure, and never applied to stay the arbitration. According to Local 17, Diamond "D" never expressly refused to arbitrate and never sought to stay arbitration of Local 17's grievance within the required twenty days (Item 24, Pearce affidavit, ¶ 7).

## II. *The First Action—91–CV–844A(F)*

On December 20, 1991, Local 17 filed an action in this court seeking to compel arbitration of the grievances set forth in the September 16, 1991, letter (Item 21, Exhibit D; Item 24, Pearce affidavit, ¶ 8).[4] In its complaint, Local 17 recounted the history of the dispute and expressly alleged that Diamond "D" had refused to participate in the grievance and arbitration procedures outlined in Article IV of the CBA, although duly demanded by the Local 17. Local 17 alleged that this refusal constituted a breach of the CBA and caused prejudice to Local 17 (Item 21, Exhibit D, ¶¶ 14–16). Local 17 did not identify any job sites where the alleged violations occurred or specify the dates when the alleged violations occurred.

On January 27, 1992, Diamond "D" answered Local 17's complaint. Although Diamond "D"'s answer was not filed with the court until September 28, 1992, Guy J. Agostinelli, Esq., Diamond "D"'s first attorney, certified that the answer was served upon Lipsitz on January 27, 1992 (91–CV–844A(F), Item 17, Certificate of Service).[5] On September 24, 1992, Agostinelli sent Magistrate Judge Foschio the original answer which Agostinelli said he had served on behalf of Diamond "D" on January 27 (*Id.*). Magistrate Judge Foschio approved the answer for filing *nunc pro tunc* January 27, 1992 (*Id*). According to the record in the first action, Local 17 never argued that it did not receive a timely response to its complaint. Thus, the court assumes that Local 17 received Diamond "D"'s answer on or about January 27, 1992.

In its answer, Diamond "D" denied that Local 17 had complied with the procedures set forth in Article IV of the CBA and denied that Diamond "D" had refused to participate in the grievance and arbitration procedures (Item 21, Exhibit E, ¶¶ 10 and 14; Item 24, Pearce affidavit, ¶ 9). More importantly, Di-

---

4. As mentioned above, the first action, 91–CV–844A(F), was assigned to the Hon. Richard Arcara. Judge Arcara subsequently referred the case to the Hon. Leslie Foschio, Magistrate Judge, to resolve a discovery dispute involving DiPizio's failure to attend a deposition. Later the parties consented to bring the trial before the Magistrate Judge.

5. Wherever possible, I refer to documents in the present action. For those documents that have not been supplied in the present action, I refer to Item numbers in 91–CV–844A(F).

amond "D" raised two affirmative defenses in its answer: (1) the court lacks personal jurisdiction over defendant due to inadequate service of process, and (2) Local 17 had not complied with all of the conditions precedent to, and applicable procedures for, initiating a grievance or arbitration under the CBA (Item 21, Exhibit E, ¶¶ 15–16). As Local 17 notes, Diamond "D" did not expressly allege in its answer that Local 17 had failed to comply with Article IV, paragraphs 2(a) or 2(b) (*See* Item 24, Pearce affidavit, ¶ 10).

Local 17 immediately began discovery in order to determine whether its service on Diamond "D" was adequate. Local 17 first sought to take the deposition of DiPizio. That deposition was scheduled for March 24, 1992. On March 18, 1992, Agostinelli·filed a motion to withdraw as attorney of record for Diamond "D" (91–CV–844A(F), Item 6) explaining that he wished to withdraw in part because of difficulties he was having communicating with his client (91–CV–844A(F), Item 7, ¶ 6). Due to this motion, the DiPizio deposition was postponed. The court granted Agostinelli's motion on April 11, 1992, and gave Diamond "D" thirty days to obtain new counsel (91–CV–844A(F), Item 8). On May 7, 1992, Local 17 sent DiPizio a new deposition notice for May 26, 1992 (91–CV–844A(F), Item 9). Local 17 contends that the certified mailing was returned unclaimed after three efforts to deliver it (91–CV–844A(F), Item 12, ¶ 7). On May 18, 1992, Bennet Leader, Esq. appeared as Diamond "D"'s new counsel, and he explained that he was unavailable to attend the May 26 deposition (*Id.*, ¶ 8).

After another unsuccessful attempt to take DiPizio's deposition, on June 22, 1992, Local 17 filed a motion to compel the attendance of DiPizio at his deposition (91–CV–844A(F), Item 12). On July 2, 1992, Magistrate Judge Foschio granted Local 17's motion and directed DiPizio to appear at his deposition scheduled for July 8, 1992 (91–CV–844A(F), Item 14). In his order, the Magistrate Judge stated that if DiPizio failed to attend his deposition, Local 17 could apply for an order imposing sanctions (*Id.*). Neither DiP-

izio, nor Leader appeared at the scheduled deposition. Consequently, on July 10, 1992, Local 17 filed a motion for sanctions for DiPizio's failure to comply with the court's July 2 order (91–CV–844A(F), Item 15). Magistrate Judge Foschio held oral argument on the motion on September 24, 1992. On December 22, 1992, Judge Arcara adopted Magistrate Judge Foschio's report and recommendation granting Local 17's motion, ordering the deposition to be scheduled within forty-five days, and awarding Local 17 costs and attorneys' fees for DiPizio's failure to appear at the July 8, 1992, deposition (91–CV–844A(F), Item 22).[6] Judge Arcara stated that DiPizio's failure to appear at the next scheduled deposition would result in the striking of the answer from the record and the entry of default against defendant (*Id.*). The deposition of DiPizio was finally conducted on January 28, 1993 (Item 38).

The DiPizio deposition was directed entirely to the issue of service of process on Diamond "D". DiPizio explained that his daughter, Joanne Hopkins, was at the office the day the process server came. Lipsitz asked a series of questions designed to reveal whether Joanne Hopkins, an employee of Diamond "D", had the authority to accept service on behalf of Diamond "D", and if so, whether the process server properly served Joanne Hopkins. Not long into the deposition, Leader started to object to nearly all of Lipsitz' questions and directed DiPizio not to answer (Item 38, pp. 16–25). Both attorneys got very frustrated, and they began raising their voices (*Id.*, pp. 20–25). The behavior of both attorneys from that point forward was inappropriate. Once it became clear to Lipsitz that Leader was not going to allow DiPizio to respond to any more questions, Lipsitz attempted to serve a new summons and complaint on DiPizio (*Id.*, pp. 22–24). Apparently, Lipsitz threw the documents either on the table or directly at DiPizio. When Leader stated on the record that Lipsitz had thrown the documents, Lipsitz demanded that DiPizio and Leader return the documents. There appears to have been some kind of struggle whereby the documents were ripped (*Id.*, p.

---

6. On April 13, 1993, Judge Arcara directed Diamond "D" to pay a total of $2,198.00 for attor- neys' fees and costs (91–844A(F), Item 29).

23). Leader thereafter directed DiPizio to take the documents and told Lipsitz that all he now had to do was fill out a certificate of service (*Id.*, p. 24).

On May 12, 1993, the parties conducted the depositions of Joanne Hopkins and Josephine Bukowski, employees of Diamond "D" and blood-relatives of DiPizio (Item 39). Again, these depositions were directed entirely to the issue of service of process. Both Lipsitz and Jeremy V. Cohen, Esq., Diamond "D"'s attorney at that time, conducted themselves in a professional and cooperative manner at these depositions.

 After taking all three depositions, Local 17 did not do anything to resolve the service issue. Lipsitz never filed a certificate of service after the DiPizio deposition, nor did he request a hearing before either Judge Arcara or Magistrate Judge Foschio on the service issue. Local 17 had notice of Diamond "D"'s affirmative defense of lack of personal jurisdiction due to inadequate service of process as early as January 27, 1992. Although Diamond "D" could have forced the issue by bringing a motion to dismiss pursuant to either Fed.R.Civ.P. 12(b)(2) or 12(b)(5), it was not required to bring such a motion.[7] This issue should have been resolved at an early stage of the litigation, because if the service was insufficient, then the court had no jurisdiction over the case, and any action it took would have been a nullity. The burden to satisfy the service requirement is on the plaintiff. Local 17 has argued that it was Diamond "D"'s lack of cooperation in producing witnesses for their depositions that delayed Local 17's ability to prove that service was complete. Although it is clear that DiPizio was most uncooperative,

Local 17 could have used other methods of proving adequate service or it could have served Diamond "D" again as soon as Local 17 became aware of the challenge.

On December 31, 1992, while Local 17 was conducting discovery on the service issue and was struggling to get DiPizio to attend his deposition, Lipsitz sent Leader a letter apparently responding to a telephone inquiry regarding the precise nature of Local 17's grievance (Item 21, Exhibit F). Lipsitz specified that the grievance involved work at and adjacent to Diamond "D"'s William Street thruway access site. Lipsitz stated that prior to September 16, 1991, persons not covered by the CBA operated various construction equipment and that Local 17's claim is that the equipment should have been operated by bargaining unit employees. Lipsitz asserted that the alleged breaches of the CBA "started prior to September 16, 1991, and continued to the time of shut down of the job, which event I believe was several months ago." (*Id.*). Lipsitz also stated that "similar violations occurred at other job locations;" however, he did not provide any specific sites or dates (*Id.*). Diamond "D" contends that this was the first time that Local 17 had provided any specific information regarding the timing and the location of the alleged violations (Item 21, Fitzgerald affidavit, ¶ 11).

By letter dated January 20, 1993, Diamond "D" advised Local 17 that Diamond D would no longer be a party to the CBA, effective March 31, 1993 (Item 21, Exhibit Q).

Judge Arcara extended the discovery deadline by order on several occasions in 1993. On January 22, 1993, Judge Arcara

---

7. In *United States v. Ziegler Bolt and Parts Co.*, 111 F.3d 878, 882 (Fed.Cir.1997), the court recognized that in some cases where a defendant has properly included lack of personal jurisdiction because of insufficient service of process in its answer but then actively litigated the suit, the defendant may be found to have waived the affirmative defense. The appellate court then affirmed the district court's finding that the defendant had not waived its affirmative defense under the circumstances. *Id.* at 883. The court found that the early notice of the defendant's affirmative defense provided the plaintiff with ample time to investigate the basis of the defense and to cure the defect. In *Datskow v.*

*Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir. 1990) (citations omitted), the Second Circuit stated that "[a] delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer." The court found that under the circumstances, the defendant was barred from complaining about defective service. Essential to the court's holding was that the defendant had attended a conference with the Magistrate Judge and had participated in scheduling discovery and motion practice without saying anything about defective service of process.

extended discovery to February 22, 1993 (91–CV–844A(F), Item 24). On February 24, 1993, Judge Arcara extended discovery to June 22, 1993 (91–CV–844A(F), Item 27). On June 4, 1993, Judge Arcara extended discovery to August 23, 1993 (91–CV–844A(F), Item 31). On June 5, 1993, Judge Arcara signed an order consenting to the substitution of Diamond "D" 's counsel (91–CV–844A(F), Item 32). Jeremy V. Cohen, Esq., became the counsel of record for Diamond "D". Due to this change of attorneys, the court extended discovery until October 22, 1993 (91–CV–844A(F), Item 34).

By letter dated September 16, 1993, Lipsitz wrote to Cohen and advised that Local 17 had completed an analysis of wage claims on Diamond "D" 's Como Park, William Street, and Cazenovia Creek Bridge jobs (Item 21, Exhibit G). Lipsitz explained that Local 17 had reviewed records from April 1, 1990, through October 31, 1991. They had compared Engineer Daily Project Reports, which specify the total amount of operating engineers' and apprentices' time for the projects with the contribution forms made, presumably by Diamond "D", to the Syracuse Trust Fund office. He asserted that Local 17's review of these documents revealed a deficiency between the hours worked as reported to the union and the hours worked as reported in the Engineers Daily Project Reports. Local 17 believed that the deficiency represented hours during which equipment must have been operated by non-bargaining unit employees and that these were the claims that Local 17 wished to arbitrate (Id.). Diamond "D" contends that, despite the pendency of Local 17's September 16, 1991, grievance letter for over two years, this letter was Local 17's first notice to Diamond "D", or its counsel, of the jobs and the dates of the alleged violations of the CBA (Item 21, Fitzgerald affidavit, ¶ 13).

Prior to the October 22, 1993, discovery deadline, Lipsitz communicated with Cohen about the possibility of a settlement (Item 32, Exhibit A, ¶¶ 10–15; 91–CV–844A(F), Item 36, ¶¶ 10–15). The contemplated settlement would have been an agreement to arbitrate the dispute with a bill of particulars setting forth and limiting the monetary claims to be arbitrated (Id., ¶ 10). Lipsitz attested that the September 16, 1993, letter, described above, was one of several communications regarding the particulars that would limit the contemplated arbitration, and that these communications were put together after considerable examination of various public documents and work performed within the proscribed time limits (Id., ¶ 12). Lipsitz affirmed that he had believed that settlement was a distinct possibility and that he completed his studies and submitted the results to Cohen by October 27, 1993 (Id., ¶ 13). On October 27, 1993, Lipsitz sent a letter to Cohen in which Lipsitz stated that if the parties were unable to reach a settlement by November 10, 1993, he would press forward with the case before Judge Arcara (91–CV–844A(F) Item 37, ¶ 10 and Exhibit 3).

Even though the parties were not able to reach a settlement by November 10, 1993, Lipsitz did not return to federal court in late 1993 or early 1994. Lipsitz explained that he spoke with Cohen on several different occasions following October 27, 1993, and that on each occasion Cohen told Lipsitz that he was having difficulties communicating with Diamond "D", and that Diamond "D" had not even responded to the settlement efforts (91–CV–844A(F), Item 36, ¶ 14). Lipsitz affirmed that the last time he spoke with Cohen about the possible settlement was in early July 1994 (Id., ¶ 15). Cohen did not dispute any of these contentions (91–CV–844A(F), Item 37, ¶ 4).

On August 26, 1994, the Clerk of the Court filed an order to show cause as to why the case should not be dismissed for failure to prosecute pursuant to Fed.R.Civ.P. 18 (91–CV–844A(F), Item 35). In his written response to the order, filed on September 13, 1994, Lipsitz conceded that he had never sought to have the discovery deadline extended beyond October 22, 1993, but he argued that he in good faith had believed that the court would schedule a pretrial conference, pursuant to local rules of the court, for the purpose of effecting a settlement (Item 32, Exhibit A, ¶¶ 16–17; 91–CV–844A(F), Item 36, ¶¶ 16–17). Lipsitz asserted that Local 17 was prepared to proceed to trial and desired to do so, and that Local 17's claim for

arbitration is meritorious (*Id.*, ¶¶ 18–19). Cohen responded by emphasizing that Diamond "D" and Local 17 had not reached a settlement agreement, that Local 17 had not returned to court once it became clear that there was no such agreement, despite its threats that it would return to court, and that Local 17's claim of entitlement to arbitration lacked any merit (91–CV–844A(F), Item 37, ¶¶ 6–13).

The court never ruled on the order to show cause. On January 30, 1995, the parties consented to proceed before Magistrate Judge Foschio pursuant to 28 U.S.C. § 636(c) (91–CV–844A(F), Item 38). On April 13, 1995, Magistrate Judge Foschio set a final scheduling order and a trial date of August 10–11, 1995 (91–CV–844A(F), Item 39). By letter dated April 27, 1995, Lipsitz asked Cohen whether Diamond "D" would stipulate to Local 17's voluntary withdrawal of the complaint (91–CV–844A(F), Item 40, Exhibit A). By letter dated April 28, 1995, Cohen responded that Diamond "D" would not consent to a withdrawal (*Id.*, Exhibit B).

On May 3, 1995, Local 17 filed a motion for voluntary dismissal without prejudice pursuant to Fed.R.Civ.P. 41(a)(2). Local 17 explained that it wished to pursue the exhaustion of all steps in the grievance procedure and thereby render moot the question of whether the court lacks jurisdiction because of an alleged failure to comply with conditions precedent to arbitration (91–CV–844A(F), Item 40, ¶¶ 4–5). Local 17's action is surprising given that less than nine months earlier, on September 13, 1994, Lipsitz assured the court that Local 17 was prepared to proceed to trial and desired to do so. Local 17 had been aware of Diamond "D"'s affirmative defenses since at least January 27, 1992. Discovery was completed by June 1993, and none of the discovery was directed at the question of whether Local 17 had satisfied the conditions precedent to arbitration. Local 17 waited until after Magistrate Judge Foschio set a trial date before it sought the dismissal.

Diamond "D" vigorously opposed the motion, arguing that there was no issue as to whether Local 17 had followed the grievance procedure and that the action should proceed only on the issue of proper service of the complaint (91–CV–844A(F), Item 42). Diamond "D" stated that "for purposes of this proceeding, [it would] stipulate that [Local 17's] failure to submit its grievance to a joint committee of Union and Association representatives pursuant to Article IV(2) is not a jurisdictional defect and is an issue of procedural arbitratibility." (*Id.*, p. 2). Diamond "D" also asserted that even if Local 17 processed its grievance against Diamond "D", it would have no right to enforce any agreement to arbitrate the grievance based on the six-month statute of limitations period having expired (*Id.*, p. 2).

On July 13, 1995, Magistrate Judge Foschio granted Local 17's motion finding that Diamond "D" would not be prejudiced by the dismissal of the action, particularly because the lack of resolution of the matter appeared to have been mainly caused by Diamond "D"'s failure to cooperate with the discovery process and because Diamond "D" had changed counsel twice (Item 21, Exhibit I, p. 7). Magistrate Judge Foschio noted that courts should defer the merits of disputes arising out of interpretations of CBAs to the arbitration procedures set up by the CBAs (*Id.*, p. 6). The Magistrate Judge also stated that:

> while not ruling on the issue, [Diamond "D"'s] argument that the six month statute of limitations period will have expired if [Local 17] attempts to refile this action may not be cognizable as it is well established that an 'action to compel arbitration accrues when a party unequivocally refuses a demand to arbitrate,' … and it has been held that an employer's failure to respond to a union's letter requesting arbitration is not an unequivocal refusal.

(*Id.*).

Magistrate Judge Foschio was correct that Diamond "D"'s conduct was one of the causes for delay. Diamond "D"'s failure to produce DiPizio for deposition ultimately resulted in the need for additional motion practice on the issue of sanctions, and Diamond "D"'s repeated change of counsel caused significant delay. Nevertheless, Local 17's lackadaisical, dilatory, and contradictory conduct was also a major cause of delay. Local 17

spent over two years conducting discovery on the service issue, delayed in returning to court once it became clear that Diamond "D" was not interested in settling, failed to supply Diamond "D" with the specific details of its grievance, and waited until trial was imminent before seeking a voluntary dismissal in order to pursue the exhaustion of all steps in the grievance procedure. Finally, the court itself was responsible for some of the delays.

### III. *The Present Action*

By letter dated August 8, 1995, Local 17 notified Diamond "D" that it wished to proceed with step 2(c) of the CBA's grievance procedure on the outstanding grievance (Item 21, Exhibit J). Local 17 explained that the details of the grievance were set forth in Lipsitz' September 16, 1993, letter, a copy of which was attached to the August 8 letter. Local 17 stated that it intended to perform the conditions precedent to arbitration and suggested that step 2(c) was the only step with which it had failed to comply. Local 17 informed Diamond "D" that on September 12, 1995, a committee of Local 17 and AGC representatives would meet to consider Local 17's grievance against Diamond "D", and pursuant to paragraph 2(c) Diamond "D" had a right to attend. Local 17 referred to the September 16, 1991, letter and noted that it had been returned unclaimed. Local 17 did not explain how it believed it had satisfied paragraphs 2(a) and (b).

By letter dated September 11, 1995, Diamond "D" explained that it believed that Local 17 had failed to comply with steps 2(a) and 2(b) of the grievance procedure, and consequently Diamond "D" would not attend the step 2(c) committee meeting (Item 21, Exhibit K). Local 17 contends that this was the first time that Diamond "D" had asserted that Local 17 had failed to comply with steps 2(a) and 2(b) (Item 24, Pearce affidavit, ¶ 17).

On September 12, 1995, the committee met to consider Local 17's grievance without the presence of Diamond "D" (Item 21, Fitzgerald affidavit, ¶ 22; Item 24, Pearce affidavit, ¶ 18). At the close of the meeting, the committee reached a deadlock decision (Item 21, Exhibit L). By letter dated September 25,

1995, Local 17 informed Diamond "D" that the committee had been unable to resolve Local 17's grievance; therefore, pursuant to paragraph 2(d), Local 17 was giving notice of its intent to submit the dispute to an arbitrator (Item 21, Exhibit M). Local 17 advised Diamond "D" that pursuant to CPLR section 7503(c), Diamond "D" had to apply to stay the arbitration within twenty days of service of such a notice of intent to arbitrate or else Diamond "D" would be precluded from objecting that a valid agreement to arbitrate existed or that it had not been complied with (*Id.*).

On October 16, 1995, Diamond "D" filed a notice of petition in New York State Supreme Court staying the arbitration and seeking a trial of the issues of the making or the failure to comply with the agreement to arbitrate (Item 21, Exhibit N). On October 30, 1995, Local 17 filed a notice of and petition for removal with this court (Item 1). On November 21, 1995, Local 17 answered Diamond "D"'s complaint and brought a counterclaim to compel arbitration (Item 2, Item 21, Exhibit O). Local 17 admitted that its September 16, 1991, grievance letter was returned unclaimed and that it had moved to dismiss the first lawsuit in order to comply with paragraph 2(c) of the grievance procedure (*Id.*, ¶¶ 17 and 25). Diamond "D" filed its answer to the counterclaim on December 14, 1995, alleging that the counterclaim was barred by both the applicable statute of limitations and by the doctrine of laches, and that the parties did not have a valid agreement to arbitrate (Item 4; Item 21, ¶ 25 and Exhibit P). The parties then commenced discovery.

On August 28, 1996, the court referred this case to Magistrate Judge Foschio for settlement conferences and set December 16, 1996, as a settlement deadline (Item 9). Apparently, the parties were unable to reach a settlement. In late January 1997, problems arose when Diamond D's then-counsel, Ginger D. Schroder, Esq. changed law firms. Ms. Schroder could no longer represent Diamond "D" due to a conflict of interest with her new firm (*See* Items 10 and 11). Although Diamond "D" had told the court that it would resolve its representation question by Febru-

ary 24, 1997, by letter dated February 13, 1997, it requested additional time to secure representation (Item 11). The court granted the extension and reminded Diamond "D" that the court wished to hold a meeting with counsel for each side on April 21, 1997 (*Id.*).

No one appeared for Diamond "D" for the April 21 meeting (See Item 13). The court contacted Leader, who had represented Diamond "D" during part of the first action and had identified himself earlier in this second action as Diamond "D"'s corporate counsel. Leader explained that Diamond "D" had contacted an attorney who was reviewing the file and had not yet made a decision on whether he could take the case. Leader requested an additional forty-five days to secure representation. The court granted the extension and warned that if Diamond "D" was not ready to proceed at the next meeting, the court would consider a motion to dismiss for failure to proceed (Item 13). On June 6, 1997, the court approved Diamond D's consent to substitute Brian P. Fitzgerald, Esq. as counsel (Item 16).

On August 4, 1997, Diamond "D" filed the pending motion for summary judgment (Item 21). On August 29, 1997, Local 17 filed the pending cross-motion for summary judgment (Item 24). The parties appeared for oral argument on January 16, 1998.

## DISCUSSION

### I. *Failure to Comply with the CBA's Conditions Precedent to Arbitration*

Diamond "D" contends that Local 17 has never complied with the conditions precedent to arbitration specified in Article IV, paragraphs 2(a)–2(d). Specifically, Diamond "D" asserts that Local 17 never attempted to discuss its grievance at the job site with Diamond "D" officials, nor did it hold a meeting between its business manager and an AGC representative. Local 17 argues that it attempted to comply with the conditions precedent to arbitration; however, Diamond "D"'s uncooperative actions made it impossible to follow the CBA's grievance procedure.

There is a strong federal policy favoring arbitrability of labor disputes between parties who have entered into an arbitration agreement. *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). When the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.,* at 650, 106 S.Ct. 1415 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, (1960)). Local 17 argues that because the grievance and arbitration provision in its CBA is broad, the question of whether Local 17 satisfied the conditions precedent to arbitration is a question for an arbitrator (Item 25, pp. 14–15). Diamond "D" contends that courts, not arbitrators, are to decide questions of arbitrability where such questions turn upon clear and unambiguous provisions of a CBA (Item 31, p. 6).

Because this unusual action can be dismissed on statute of limitations grounds, the court does not need to conduct a lengthy analysis of these arguments. Nevertheless, it is important to note that in the usual case, the question of whether the party seeking arbitration has complied with all contractual conditions precedent to arbitration is a question for an arbitrator. It is well established in this circuit that "the duty to arbitrate is wholly contractual and the courts have the obligation to determine whether there is a contract imposing such a duty." *Procter & Gamble Independent Union, etc. v. Procter & Gamble Mfg. Co.,* 312 F.2d 181, 184 (2d Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). Thus, when disputing parties are bound by an arbitration agreement, the court must determine whether the parties' agreement creates a duty for the parties to arbitrate the particular grievance. *Cleveland Wrecking Co. v. Iron Workers Local 40,* 136 F.3d 884, 888 (2d Cir.1997) (citing *AT & T Tech,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *Litton Financial Printing v. N.L.R.B.,* 501 U.S. 190, 208,

111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). "If [an] arbitration clause is broad, then [a court] must find that the parties bargained to have any dispute that arguably falls within the scope of that clause settled through arbitration, absent compelling proof to the contrary." *Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886 (2d Cir.1982) (citing *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 571, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring) ("the parties may have provided that any dispute as to whether a particular claim is within the arbitration clause is itself for the arbitrator.... (T)he court, without more, must send (the) dispute to the arbitrator, for the parties have agreed that the construction of the arbitration promise itself is for the arbitrator ....")); *Cleveland Wrecking Co. v. Iron Workers Local Union 40*, 947 F.Supp. 745 (S.D.N.Y.1996). Once the court recognizes that the dispute should go to an arbitrator, the court may not resolve any of the substantive elements of the dispute, no matter how obvious the resolution appears.

■ Diamond "D"'s argument that it cannot be compelled to arbitrate Local 17's grievance because Diamond "D" was not a party to the CBA on August 8, 1995, is flawed. In *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 253, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), the Supreme Court recognized that the duty to arbitrate is a creature of contract, but stated that "in the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract." In that case, the CBA terminated four days before the underlying grievance arose, yet the Court found that the agreement to arbitrate covered the grievance. Thus, so long as the underlying grievance occurred while the CBA was in effect, a party can be compelled to arbitrate that grievance. The parties agree that the underlying grievance occurred while their CBA was in effect.

In *Schweizer Aircraft v. Local 1752, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 29 F.3d 83 (2d Cir.1994), the Second Circuit explained that the question of whether a party has satisfied the CBA's time requirements governing the submission of a grievance is precisely the genre that the Supreme Court has segregated for arbitral decision. *Id.* at 88 (citations omitted). The Second Circuit emphasized that courts should only decide whether the union timely presented, for judicial determination, its case to compel arbitration. "The question of whether the time requirements in the CBA were met, as well as the substantive interpretation of the CBA, must be determined by the arbitrator." *Id.*

. ■ Diamond "D" has argued that Local 17 failed to meet the time requirements for each of the conditions precedent for arbitration. Although this argument on its face appears to be one for arbitral determination, the *Schweizer Aircraft* court stated that a court must first decide whether the union timely presented, for judicial determination, its case to compel arbitration. Local 17 commenced its first action to compel arbitration approximately three months after it first brought its grievance to Diamond "D"'s attention. Some two years later, Local 17 revealed that it was challenging Diamond "D"'s actions going back approximately one and one-half years before it first raised its grievance. Local 17 suggests that it took some time to obtain and properly analyze the records that could support its theory. There is no doubt in some cases parties to labor disputes have to review detailed records before they can present their case before an arbitrator. Nevertheless, it is troubling that Local 17 did not provide the court or Diamond "D" with any specific details of their dispute until September 16, 1993, approximately two years after it filed its first action to compel arbitration, and roughly two and one-half years after Diamond "D" had started its alleged improper labor practice. It is difficult to believe that Local 17 could not specify the particular sites on which they believed violations had occurred or provided some range of dates.

Diamond "D" argues that Local 17 filed its action to compel arbitration before it had built its full case and that Local 17 took advantage of the discovery delays and the

sufficiency of service dispute to build its substantive case. Although there is no direct evidence that Local 17 had such a motive, a careful review of the record supports Diamond "D"'s theory. Local 17's complaint did not specify any job sites or provide any dates for the alleged violations. It was not until December 31, 1992, when Local 17 provided any specifics, and even then Local 17 only mentioned one job site and stated that the violations started "prior to September 16, 1991." It was not until September 16, 1993, that Local 17 gave a more specific range of dates and added two other job sites to its grievance. Thus, although it is arguable that Local 17 filed its first action in a timely fashion, Local 17 did not present its full case to compel arbitration for judicial determination in a timely manner.

## II. *Statute of Limitations—Section 10(b) of the National Labor Relations Act*

█ Diamond "D" contends that Local 17's counterclaim to compel arbitration should be dismissed because it is time-barred under section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). Section 10(b) provides, in relevant part, that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge." Federal courts have applied this six-month statute of limitations to actions to compel arbitration. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Schweizer Aircraft*, 29 F.3d at 87. "An 'action to compel arbitration accrues when a party unequivocally refuses a demand to arbitrate.'" *Schweizer Aircraft*, 29 F.3d at 87 (quoting *Associated Brick Mason Contractors v. Harrington*, 820 F.2d 31, 33 (2d Cir.1987)). The parties agree that the six-month limitation period and the unequivocal refusal test apply to this action; however, they disagree over the related questions of (1) what language or behavior constitutes an unequivocal refusal to arbitrate, and (2) when the limitations period started to accrue in this dispute.

Diamond "D" contends that its refusal to arbitrate occurred as early as December 20, 1991, when Local 17 filed its complaint to compel arbitration in 91–CV–844A(F) (Item 22, pp. 8–9). It asserts that the first action was specifically premised upon the allegation that it had refused to arbitrate (Item 31, p. 14) and argues that in paragraphs 14–16 of Local 17's complaint in 91–CV–844A(F), Local 17 stated that Diamond "D" had "refused" to participate in the grievance and arbitration procedures outlined in Article IV of the CBA (Item 22, pp. 8–9; Item 31, p. 14). Diamond "D" asserts that courts have repeatedly held that admissions in pleadings constitute admissible evidence against the party who offered the pleading (Item 22, p. 10; Item 21, Exhibit D, ¶¶ 14–16). Diamond "D" submits that these "admissions" acknowledge that the statute of limitations started to run on or before December 20, 1991; and therefore, Local 17's counterclaim to compel arbitration in this second action, brought on November 21, 1995, is untimely by almost three and one-half years (Item 22, p. 9).

Diamond "D" also argues that in his September 23, 1994, response to the Clerk of the Court's order to show cause, Lipsitz stated that Diamond "D" had refused to proceed to arbitration (Item 31, p. 15; Item 32 Exhibit A). Diamond "D" submits that this statement, like those contained in Local 17's first complaint, constitute binding admissions (Item 31, p. 16). Diamond "D" contends that Local 17 has failed to offer any explanation for this sworn statement and that Local 17 should not be allowed in one action to claim, allege, and swear as to Diamond "D"'s refusal to arbitrate and then claim, in a second action, that Diamond "D" never refused to arbitrate (*Id.*, p. 15).

Local 17 contends that Diamond "D" did not unequivocally refuse to arbitrate until October 16, 1995, when Diamond "D" sought to stay arbitration in New York State Supreme Court (Item 25, p. 11). Local 17 insists that Diamond "D" never explicitly refused to arbitrate in the first action. Local 17 explains that its October 24, 1991, letter was a timely demand for arbitration, and that Diamond "D" never responded to that letter, even though it has acknowledged receiving the letter (*Id.*, p. 8). According to Local 17, Diamond "D" never refused to arbitrate, nor

sought to have arbitration stayed within twenty days of service of Local 17's notice to arbitrate. Furthermore, Local 17 argues that Diamond "D" still did not express a refusal to arbitrate even after Local 17 filed its complaint in the first action (*Id.*). Moreover, Local 17 notes that in Diamond "D"'s answer to the complaint in the first action, Diamond "D" denied that it had refused to arbitrate (*Id.*, p. 8; Item 21, Exhibit E, ¶ 14). Local 17 contends that the language of its complaint in the first action does not prove that Diamond "D" had unequivocally refused to arbitrate the grievance (Item 25, pp. 8–9).

At oral argument, Pearce argued that Diamond "D" has been directly responsible for the protracted nature of this dispute, and suggested that Local 17 should not now be punished for Diamond "D"'s dilatory tactics (Item 35, pp. 29–30, 39). He noted that Diamond "D"'s refusal to make DiPizio available for depositions, ultimately resulting in motions to compel the deposition and for sanctions, and Diamond "D"'s repeated changes in counsel resulted in significant delays in the first action (*Id.*, pp. 29–30). Pearce insisted that Diamond "D" had plenty of opportunity through plenty of attorneys to unequivocally deny arbitration (*Id.*, p. 39).

A careful review of the history of this dispute reveals that Diamond "D" is only partially responsible for the protracted nature of this dispute. Local 17 is also responsible for the considerable delay. First, Local 17 failed to provide any specific details on the nature of its grievance until December 31, 1992, over a year after it had commenced the first action. The December 31 letter only stated that the grievance involved work at and adjacent to Diamond "D"'s William Street thruway access site, and that the actions being challenged started prior to September 16, 1991. Thus, the letter did not pinpoint the precise timing of the alleged violations. It was not until September 16, 1993, approximately two years after Local 17 lodged its initial complaints, that Local 17 supplied the range of April 1, 1990, through October 31, 1991, as the timing of the alleged violations and specified two additional job sites where the violations allegedly occurred. Local 17 failed to explain why it waited until

September 1991 to first complain about the challenged actions, particularly in light of Diamond "D"'s contention that the job sites were easily observable by passersby, nor did Local 17 explain why it took so long to provide the specific details of the grievance.

Second, Local 17 failed to return to court in late 1993 and early 1994 after repeated indications that Diamond "D" was not interested in settling the first action. Cohen affirmed that he repeatedly told Lipsitz that Cohen had not received any affirmative responses or approval from his client concerning possible settlement (91–CV–844A(F), Item 37, ¶¶ 9–12). Although on October 27, 1993, Local 17 told Diamond "D" that Local 17 would return to court if the parties failed to reach a settlement by November 10, 1993, Local 17 did not return to court until the Clerk issued its order to show cause on August 26, 1994. Lipsitz' argument that he was waiting for the court to schedule a pretrial conference does not discharge his responsibility to diligently prosecute his case. It is not clear when Local 17 would have returned to court if the Clerk had not intervened. None of this considerable delay can be attributed to Diamond D.

Third, Local 17 failed to promptly resolve the service dispute. There is no question that DiPizio's lack of cooperation in appearing for his deposition affected Local 17's ability to prove that it had effectively served its complaint on Diamond "D". Nevertheless, Local 17 had the burden of proving proper service. Local 17 was aware of Diamond "D"'s affirmative defense contesting service at least as early as January 27, 1992, when Agostinelli served Diamond "D"'s answer on Local 17. Local 17 could have requested that the court hold a hearing at which the process server, DiPizio, and Joanne Hopkins would have testified. Diamond "D" did not have the obligation to demand such a hearing. Rule 12(b) permits a defendant to assert the affirmative defenses of lack of jurisdiction over the person and inadequate service of process either in its answer or in a Rule 12 motion. Diamond "D" properly asserted its affirmative defense in its answer. As explained above, under certain circumstances a defendant's partic-

ipation in litigation after asserting such a defense in its answer can constitute a waiver of the defense. *See Ziegler Bolt and Parts Co.,* 111 F.3d at 882–83; *Datskow,* 899 F.2d at 1302–03. By raising the defense in its answer, Diamond "D" provided Local 17 with ample opportunity to investigate the problem and cure the defect. Although Diamond "D" did participate in discovery and attended scheduling conferences, Diamond "D" consistently repeated its belief that service had been inadequate. Neither Judge Arcara, nor Magistrate Judge Foschio considered whether Diamond "D" waived its affirmative defense by participating in the litigation, and it seems inappropriate to make such a ruling here. Nonetheless, the circumstances of this case suggest that the delay in resolving the service issue from the time Local 17 received Diamond "D" 's answer until after the trial date was set can be attributed to Local 17 alone.

The Second Circuit has not established a test for what constitutes an unequivocal refusal to arbitrate under section 10(b). Surprisingly, not many courts have addressed this question. The few applicable published decisions demonstrate that the particular circumstances of the history of the dispute and the parties' attempts at resolving the dispute control the determination of when a party unequivocally refused to arbitrate. In *Schweizer Aircraft,* 29 F.3d at 87, the Second Circuit's most recent pronouncement on the subject, the court briefly articulated the "unequivocal refusal" standard and held without extended discussion that the employer's petition in New York Supreme Court to stay arbitration was its only unequivocal refusal to arbitrate. The court did not say that in all cases only petitions to stay arbitrations would meet the unequivocal refusal standard. In *Associated Brick,* 820 F.2d at 38, the Second Circuit held that because the particular arbitration agreement required that a demand for arbitration be in writing, the action did not accrue until the employer rejected the union's written demand for arbitration. In its discussion of the propriety of a six-month statute of limitations, the court noted the importance of "speedy settlement" of labor disputes. *Id.* at 37. Finally, in *Hotel Greystone v. New York Hotel & Motel*

*Trades Council,* 902 F.Supp. 482, 484–85 (S.D.N.Y.1995), the district court held that because the hotel had participated in arbitration and appeared at a hearing on the union's application for a reconsideration of the arbitrator's decision, the action began to accrue only after the hotel had filed a petition to stay the arbitration.

The cases from other circuits cited by Local 17 also demonstrate that the particular circumstances of each case control the "unequivocal refusal" inquiry. *See, Aluminum Brick and Glass Workers v. AAA Plumbing,* 991 F.2d 1545, 1548–49 (11th Cir. 1993) (holding that under the circumstances the language "I am sure you will agree that the matter is closed and it would be inappropriate to reopen it at this time" does not amount to an unequivocal refusal to arbitrate); *UAW Local 1748 v. Midwesco,* 884 F.Supp. 196, 198 (W.D.Va.1995) (holding that the employees failure to respond to the union's letter requesting arbitration is not an unequivocal refusal to arbitrate). Also, in *Local Joint Exec. Bd. v. Exber, Inc.,* 994 F.2d 674, 676 (9th Cir.1993), the court held that "for an employer to 'make it clear' that it refuses to arbitrate and, therefore, to start the statute of limitations running, an unequivocal, express rejection of the union's request for arbitration must be communicated to the union. Constructive notice is not sufficient." Nevertheless, the *Exber* court did not explain what conduct constitutes an unequivocal refusal to arbitrate and what conduct merely provides constructive notice.

Given the repeatedly stated public interest in a prompt resolution of labor disputes, this court believes that the unequivocal refusal standard does not turn on whether the party resisting arbitration has filed a petition to stay arbitration or has uttered the magic words "we refuse to arbitrate this dispute." Unambiguous conduct must also rise to the level of an unequivocal refusal to arbitrate. Unfortunately, the cases from both this circuit and others do not set forth any useful rules for when conduct can constitute an unequivocal refusal to arbitrate. The cases point out examples of conduct that does not rise to the level of an unequivocal refusal,

but none discusses the unusual circumstances presented by this case.

■ Diamond "D" 's consistent opposition to Local 17's attempts to compel arbitration for the past six-plus years constitutes an unequivocal refusal to arbitrate. From the very beginning of the dispute, Diamond "D" was uncooperative. Diamond "D" never responded to any of Local 17's correspondence before Local 17 commenced the first action, including the October 24, 1991, letter giving notice of Local 17's intention to arbitrate its grievance that Diamond "D" acknowledged receiving. Diamond "D" did not participate in any grievance arbitration procedure. In its answer to the first complaint, Diamond "D" asserted the affirmative defenses of insufficient service of process and the failure to satisfy the conditions precedent to arbitration. Although Diamond "D" denied that it had refused to arbitrate, its actions before and after it filed its answer were to the contrary. Certainly, these acts by themselves do not constitute an unequivocal refusal to arbitrate; nevertheless, these acts were just the beginning of Diamond "D" 's consistent conduct opposing Local 17's position that it was entitled to arbitrate its grievance.

The parties litigated the question of whether Diamond "D" could be forced to arbitrate Local 17's grievance for nearly four years. Once Local 17 had filed its action in federal court, there was no need for Diamond "D" to file a separate suit to stay arbitration. As explained in detail above, both parties were responsible for the protracted nature of the first action. Regardless of who was responsible, Diamond "D" consistently opposed Local 17's contention that it was entitled to arbitrate.

The record reveals that Local 17 was the impetus behind the attempts to reach a settlement in the first action. Although Local 17 might have found a sympathetic ear in Diamond "D" 's third attorney, there is no evidence that Diamond "D" itself was ever willing to discuss settlement. By Lipsitz' own admission, Cohen repeatedly told Local 17 that his client would not respond to his inquiries as to whether Diamond "D" would be willing to discuss settlement (Item 32, Exhibit A, ¶ 14). On October 26, 1993, Co-

hen informed Lipsitz that he had not received any affirmative response or approval from Diamond "D" concerning possible settlement. Cohen repeated this message on November 8 and November 19, 1993. Although Lipsitz threatened to resume litigation if the parties did not reach an agreement by November 10, 1993, he did not return to court until the Clerk issued its order to show cause on August 26, 1994. Lipsitz stated that the last time he spoke with Cohen regarding the possibility of settlement was sometime during July 1994, but his contentions were extremely vague, and he never explained why it was reasonable for him to believe that settlement was still possible after his November 10, 1993, deadline passed. Because Diamond "D" had not filed a counterclaim, Local 17 had the entire burden of prosecuting its claims before the court. Nevertheless, once the October 22, 1993, discovery deadline passed, Local 17 failed to return to court.

The court declines to find that Local 17's statements in paragraphs 14–16 of its initial complaint and Lipsitz' statement in his September 23, 1994, response to the Clerk's order to show cause constitute admissions that prove that Diamond "D" unequivocally refused to arbitrate even before Local 17 filed the first action. Diamond "D" expressly denied Local 17's allegations contained in paragraphs 14–16 of Local 17's complaint, including the statement that Diamond "D" had refused to arbitrate, when Diamond "D" answered the complaint (Item 21, Exhibit E, ¶ 10). Lipsitz' subsequent assertion that Diamond "D" had refused to arbitrate is hardly more than a repetition of Local 17's allegations in its complaint, and in the nearly three years since the complaint had been filed Diamond "D" had not changed its answer to agree that it had refused to arbitrate.

When Local 17 sought a Rule 41(a)(2) voluntary dismissal of the first action, Diamond "D" vigorously opposed the dismissal, arguing that because Local 17 had failed to follow the grievance procedures set forth under the CBA, Diamond "D" was not under any obligation to arbitrate. Diamond "D" did offer to stipulate that Local 17's failure to submit its grievance to a joint committee is not a

jurisdictional defect and is an issue of procedural arbitrability, but this offer was not a concession to Local 17's position. Despite the fact that Local 17 sought the voluntary dismissal in order to cure its alleged procedural defaults, nothing in the record suggests that Diamond "D" was willing to arbitrate the grievance once Local 17 had satisfied the conditions precedent to arbitration.

Without pinpointing an exact date, it should have been clear by November 1993 that Diamond "D" refused to arbitrate. Local 17's grievance. November 10, 1993, was the date Lipsitz selected as a deadline for settlement negotiations. Each time Lipsitz spoke to Cohen prior to that date, Cohen explained that his client had not indicated any interest in settling and that his client had not returned many of his calls. Although Lipsitz asserted that the last time he spoke with Cohen about settlement was sometime in July 1994, Lipsitz was very vague about his conversations with Cohen, and he failed to explain why it was reasonable for him to believe that settlement was possible after November 10, 1993. By January 30, 1995, approximately six months had passed since Lipsitz' last conversation with Cohen regarding the possibility of settlement, the Clerk had issued its order to show cause as to why the case should not be dismissed for failure to prosecute, Lipsitz had filed his response to the Clerk arguing that Local 17's claim to be entitled to arbitration was meritorious and that Local 17 was ready for trial, Cohen had filed an opposition memorandum that emphasized Diamond "D"'s belief that Local 17's claims lacked merit, and the parties had consented to go to trial before Magistrate Judge Foschio. Thus, it was clear by then that Diamond "D" had no intention of submitting to arbitration and that it would go to trial on that issue in order to avoid arbitration. Local 17's counterclaim to compel arbitration, brought on November 21, 1995, was therefore untimely.

### III. *The Doctrine of Laches*

Diamond "D" contends that Local 17's delay in bringing an action on violations which allegedly started in April 1990 and its failure to identify by date, time, or job site the alleged violations until September 16, 1993, runs contrary to the specific purpose and intent of both the grievance procedure in their CBA and federal labor law. As a result, Diamond "D" submits that the doctrine of laches applies to this case and bars Local 17's claims to grieve or arbitrate (Item 22, pp. 15–16). Local 17 argues that because the arbitration clause of the CBA is broad, questions arising from the interpretation of the CBA, including whether the doctrine of laches bars arbitration, are properly left to the expertise of the arbitrator (Item 25, p. 15).

Although a careful analysis of the procedural background of this case might suggest that the case should be dismissed under the doctrine of laches, the question of whether Local 17's grievance is barred by laches would be one for an arbitrator. In *International Union of Operating Engineers v. Flair Builders, Inc.,* 406 U.S. 487, 491, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), the Supreme Court held that the arbitration clause of the CBA governing the parties, which provided for the arbitration of "any difference" between the parties, included the issue of laches raised by the employer at trial. The Court reiterated that it is the responsibility of the courts to determine whether the parties have agreed to arbitration. Yet, the Court explained that once a court finds that the parties are subject to arbitrate and that the agreement extends to "any difference" between them, then a claim that a particular grievance is barred by laches is an arbitrable question under the agreement. *Id.,* at 491–92, 92 S.Ct. 1710. Courts in this circuit have consistently applied this holding. *See Consolidated Rail Corp. v. Metropolitan Transportation Authority,* 1996 WL 137587 *11 (S.D.N.Y.); *Hudson–Berlind Corp., v. Local 807,* 597 F.Supp. 1282, 1285 (E.D.N.Y.1984).

In the instant case, the grievance and arbitration procedure provided for the resolution of "all grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observation of any provision of [the] agreement" (Item 21, Exhibit A). If anything, this provision is even more broad than the one considered by the Supreme Court in *Flair Builders.* This very broad provision most

certainly includes the claim whether Local 17's particular grievance is barred by laches.

Nevertheless, because this action can be dismissed on statute of limitations grounds, there is no need to send the question of whether Local 17's grievance is barred by laches to an arbitrator.

## CONCLUSION

For the foregoing reasons, the court hereby grants Diamond "D"'s motion for summary judgment permanently staying the arbitration (Item 21) and denies Local 17's motion for summary judgment (Item 24). Consequently, the action is hereby dismissed in its entirety.

So ordered.