18-1086-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2018

(Argued: May 3, 2019                    Decided: November 21, 2019)

Docket No. 18-1086

_____

ATLAS AIR, INC., SOUTHERN AIR, INC.,

*Plaintiffs-Appellees*,

*- against -*

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE PROFESSIONALS
ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION
NO. 1224, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION,

*Defendants-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:
    KEARSE, WESLEY, and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the

Southern District of New York (Forrest, *J.*) compelling arbitration of grievances

raised by plaintiffs-appellees airlines in a dispute with the collective bargaining

representatives of their pilots. The district court granted the airlines' motion for summary judgment and to compel arbitration, holding that (1) the parties' disputes are subject to mandatory arbitration; (2) the airlines' motion to compel arbitration was timely; and (3) the disputed issues raised by the management grievances are arbitrable.

AFFIRMED.

JUDGE KEARSE partially dissents in a separate opinion.

---

EDWARD GLEASON (Franklin K. Moss, *on the brief*), Law Office of Edward Gleason PLLC, Washington, DC, *and* Spivak Lipton LLP, New York, New York, *for Defendants-Appellants*.

ROBERT A. SIEGEL (Michael G. McGuinness *and* Sloane Ackerman, *on the brief*), O'Melveny & Myers LLP, Los Angeles, California *and* New York, New York, *for Plaintiffs-Appellees*.

---

CHIN, *Circuit Judge*:

This labor relations case arises from the merger of two commercial airlines, plaintiffs-appellees Atlas Air, Inc. ("Atlas") and Southern Air, Inc. ("Southern") (together, the "Employers"). The Atlas and Southern pilots are

represented by defendants-appellants International Brotherhood of Teamsters ("IBT"), International Brotherhood of Teamsters Airline Division ("IBTAD"), and Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively, the "Union"). Following the announcement of the merger, disagreements arose as to the integration of the respective employees and operations, whether the Union was required to negotiate a new joint collective bargaining agreement ("JCBA") to cover both sets of pilots, and whether the disagreements were to be resolved in arbitration or before the National Mediation Board (the "NMB").

After the parties failed to resolve their controversies, the Employers commenced this action below to compel arbitration of the management grievances. The district court granted the Employers' motion for summary judgment and to compel arbitration and denied the Union's motion for summary judgment. On appeal, we hold that the district court properly granted the Employers' motion for summary judgment and to compel arbitration. Accordingly, the judgment of the district court is affirmed.

*BACKGROUND*

**I.     *The Facts***

**A.     *Labor Relations in the Airline Industry***

The Railway Labor Act (the "RLA"), 45 U.S.C. § 151 *et seq.*, regulates labor relations in the airline industry. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994) (citing 45 U.S.C. §§ 181-188). The purpose of the RLA is to prevent service interruptions in the transportation industries by encouraging labor peace and avoiding strikes. *See, e.g., CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 995 (2d Cir. 1989) (citing 45 U.S.C. § 151a and *Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142, 148 (1969)). The courts' role in "enforcing substantive obligations under the RLA is circumscribed by its unique history and dispute-resolution framework," and the statute sets forth "a unique blend of moral and legal duties looking toward settlement through conciliation, mediation, voluntary arbitration, presidential intervention, and, finally, in case of ultimate failure of the statutory machinery, resort to traditional self-help measures." *Air Line Pilots Ass'n, Int'l v. Tex. Int'l Airlines, Inc.*, 656 F.2d 16, 19-20 (2d Cir. 1981) (internal quotation marks omitted).

The RLA's dispute resolution mechanisms include mediation before the NMB and binding arbitration before "adjustment boards." *CSX Transp.*, 879 F.2d at 995-97; *accord W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302 (1987). Adjustment boards are panels consisting of designated representatives of the carrier and employees that resolve disputes arising under existing contracts between labor groups and employers. *See Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 686 (1963); *Ollman v. Special Bd. of Adjustment No. 1063*, 527 F.3d 239, 246 (2d Cir. 2008). As explained more fully below, the mechanism that the parties must use to resolve a controversy depends on the type of dispute between the parties, *i.e.*, whether the dispute is a "major," "minor," or "representation" dispute. *See CSX Transp.*, 879 F.2d at 995-98; *Air Line Pilots Ass'n*, 656 F.2d at 20 n.6. Major and representation disputes fall within the exclusive jurisdiction of the NMB, while minor disputes must be arbitrated before an adjustment board. *See CSX Transp.*, 879 F.2d at 995-98; *Air Line Pilots Ass'n*, 656 F.2d at 20 n.6.

### B. The Parties

Atlas is a commercial air carrier and wholly owned subsidiary of Atlas Air Worldwide Holdings, Inc. ("AAWH"). Atlas is party to a collective

bargaining agreement (the "Atlas CBA") that governs the pay, rules, and working conditions of the Atlas pilots. The Atlas CBA also covers another AAWH subsidiary, Polar Air Cargo Worldwide, Inc. ("Polar"), which is not a party to this action. The Atlas CBA became effective on September 8, 2011 and became amendable -- or open for further negotiation -- on September 8, 2016.

In April 2016, AAWH acquired Southern Air Holdings, Inc., the parent of Southern, making Southern a subsidiary of AAWH. Southern is party to a collective bargaining agreement (the "Southern CBA") that governs the pay, rules, and working conditions of the Southern pilots. The Southern CBA became effective on November 6, 2012 and amendable on November 6, 2016.

IBT is the certified collective bargaining representative of the Atlas and Southern pilots under the RLA. IBTAD is a party to both the Atlas CBA and the Southern CBA. IBTAD, through IBT, has designated Local 1224 as the local collective bargaining agent for the Atlas and Southern pilots.

C.      *The Collective Bargaining Agreements*

1.      *Atlas*

The Atlas CBA recognizes Atlas and Polar as "a single Air Carrier collectively referred to as the 'Company.'" *Id.* at 38. Pursuant to a 2011

arbitration award, AAWH is not subject to the Atlas CBA's "scope provisions," which relate to the scope of covered work, job security, and labor protections in the event of certain corporate transactions. Under the Atlas CBA, the parties' obligation to "merge the two pre-integration collective bargaining agreements into one agreement," *id.* at 44-45 (Section 1.F.b.iii), that is, to negotiate a JCBA, is triggered by the following conditions:

> (i) the Company acquires another air carrier and the Company decides there will be a complete operational merger between the Company and such other air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the respective carriers, or (ii) in the event the Company decides there will be a complete operational merger between the Company and an affiliated air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and an affiliated air carrier . . . [and] the crewmembers of the acquired carrier are represented by the Union.

*Id.* at 43-44 (Section 1.F.2).

The parties have nine months to execute a JCBA from the date the Union presents the Company with a merged seniority list. If the parties are unable to agree on the terms of a JCBA, the parties must submit the outstanding issues to binding interest arbitration within thirty days of the conclusion of negotiations contemplated by the Atlas CBA.

Section 21 of the Atlas CBA provides that the System Board of Adjustments (the "Atlas Board") "shall have jurisdiction over all disputes between . . . the Company and the Union, growing out of the interpretation or application of any of the terms" of the Atlas CBA. *Id.* at 24. In addition, Section 1.H.1 of the Atlas CBA states that "[a]ny grievance filed by the Company or Union alleging a violation of Section 1 shall bypass the initial steps of the grievance process and shall be submitted, heard, and resolved through binding arbitration on an expedited basis directly before the [Atlas Board]." *Id.* at 46.

### 2. Southern

The Southern CBA provides that

[i]n the event of a merger between the Company and any other company or business that employ crewmembers of aircraft, there shall be an integration of the two crewmember groups . . . . A "merger" as used in this Section, shall refer to a transaction in which the functional departments of the Company (e.g., operations, marketing, finance, human resources, etc.) are integrated with those of another certificated air carrier employing crewmembers . . . .

In the event of a merger, this Agreement shall be merged with the merging air carrier's crewmember collective bargaining agreement, if any; if such merged agreement is not completed within nine (9) months from the date an integrated Master Seniority List is submitted to the surviving entity, the parties shall submit all outstanding issues to binding interest arbitration.

*Id.* at 54 (Sections 1.B.2-3).

Section 19(D)(2) of the Southern CBA also establishes a System Board of Adjustment (the "Southern Board") and provides that the Southern Board "shall have jurisdiction over disputes growing out of grievances or out of the interpretation of application of any terms" of the agreement. *Id.* at 34.

### D. The Management Grievances

On January 19, 2016, AAWH announced its intent to merge the operations of Atlas and Southern. Both Atlas and Southern took the view that the parties were then required to negotiate a JCBA covering both companies' pilots in accord with Sections 1.F and 1.B of their respective collective bargaining agreements. The Union disagreed, taking the position that Atlas and Southern were required to engage in separate negotiations to amend each company's individual collective bargaining agreement.

#### 1. Atlas

On April 13, 2016, the Union filed an application with the NMB pursuant to Sections 5 and 6 of the RLA for mediation of the dispute. The NMB acknowledged the Union's application by letter dated April 19, 2016, advising that the NMB would "investigate the complexity of issues associated with this

application prior to beginning any mediation sessions," and that the application

had been docketed. *Id.* at 208-09.

The next day, April 14, 2016, Atlas filed a management grievance

(the "Atlas grievance") with the Atlas Board pursuant to Section 204 of the RLA

and Section 1.H of the Atlas CBA for expedited grievance arbitration. Atlas

requested that the Atlas Board decide whether the Union was "[in] violati[on of]

Section 1.F.2.b.iii of the Atlas-IBT CBA by refusing to engage in negotiations for a

[JCBA] pursuant to the terms and conditions set forth therein in light of the

announced operational merger of Atlas and Southern Air, Inc.?" *Id.* at 47. The

Union responded, by letter dated April 20, 2016, that stated:

> the purported management grievance is intricately
> related to, and indeed dependent upon, the resolution
> of RLA statutory issues underlying our dispute,
> including issues relating to the NMB's jurisdiction and
> pending investigation, the Company's obligations
> under 45 U.5.C. § 152, First and 45 U.S.C. § 156, and its
> obligations under 45 U.S.C. §§ 155 and 156. As you
> know, the System Board lacks jurisdiction to address
> matters arising outside the contract, including the
> statutory issues involved in the purported management
> grievance. It is inappropriate for the Company to
> attempt to vest the System Board with jurisdiction that
> it does not have. *The purported grievance is, therefore,
> invalid and not arbitrable.*

> *Finally, we look forward to an amicable resolution of our dispute through consensual negotiations, as provided for under the RLA.*

*Id.* at 135 (emphasis added).

Subsequently, the parties engaged in ongoing discussions concerning a proposed JCBA that would cover the Atlas, Polar, and Southern pilots. By example, the parties met on May 10, 2016 to discuss the dispute. At the meeting, Atlas proposed that "it was willing to remove the scope clause," Section 1.B of the Atlas CBA, "from the Section 1.F interest arbitration process, and instead bargain for a mutually acceptable scope clause in advance of the Section 1.F process." *Id.* at 152. IBT indicated that it would consider Atlas's compromise proposal, and "on that basis, the Company temporarily deferred pursuing arbitration on the management grievance pending a response from the IBT." *Id.*

On July 14, 2016, IBT rejected Atlas's compromise proposal and sent Atlas an email that provided "a discussion draft of [its] proposal on how to proceed with negotiations." *Id.* at 136; *see id.* at 78. Attached to IBT's email was a thirteen-page draft of a proposed letter of agreement ("LOA"), detailing how the parties might proceed to negotiate a JCBA. Significantly, the proposed letter

agreement included the following language: "While this LOA remains in effect

. . . Parties agree to suspend/toll/defer their dispute relating to the management

grievance." *Id.* at 139. In addition, the proposal included terms relating to

arbitration.

Atlas responded with a counter-proposal on August 12, 2016, and

IBT responded by letter dated September 2, 2012. IBT's response stated the

following:

> Despite our concerns relating to your failure to adhere to our
> mutually agreed-upon ground rules relating to our settlement
> discussions and refusal of our previous settlement offers on a
> path to an equitably negotiated CBA, we continue to believe
> that it is in everyone's best interest to find an amicable,
> expeditious resolution of our dispute. It is for this reason that
> *we remain ready, willing and able to meet with you and your*
> *colleagues in a further effort to resolve our dispute.* Accordingly,
> please advise us at your earliest convenience whether you and
> your colleagues share our desire to meet again in an effort to
> amicably resolve our dispute. If you do, *please also provide us*
> *with your available dates, times and locations so that we can*
> *schedule a follow-up meeting.*

*Id.* at 156 (emphasis added). Following that exchange, the parties continued to

negotiate whether and on what terms they could negotiate a JCBA or amend the

Atlas CBA. Those discussions effectively ended in February 2017.

### 2. Southern

The Union filed an application for mediation with the NMB as to its dispute with Southern on January 10, 2017, docketed the next day, to which Southern objected in a January 24, 2017 letter to the NMB. On January 24, 2017, Southern filed its own management grievance (the "Southern grievance") with the Southern Board against the Union asserting a violation of Section 1.B.3 of the Southern CBA. By letter dated February 8, 2017, the Union responded that the Southern grievance was "nonarbitrable" and that the Union "look[ed] forward to an amicable resolution of our dispute through consensual negotiations." *Id.* at 197.

## II. Proceedings Below

Atlas and Southern commenced this action on February 7, 2017. The same day, they moved for summary judgment and to compel arbitration, arguing that the disputes over the interpretation of the Atlas CBA and the Southern CBA were minor disputes within the meaning of the RLA, and thus subject to mandatory arbitration before the Atlas Board and Southern Board. On July 20, 2017, the Union moved to dismiss the action. The district court converted the Union's motion to dismiss to a cross-motion for summary

judgment. On March 13, 2018, the district court issued an opinion granting summary judgment in favor of the Employers, compelling arbitration, and denying the Union's cross-motion for summary judgment.

Judgment was entered accordingly, and this appeal followed.

*DISCUSSION*

We review a district court's grant of summary judgment *de novo* "where . . . the parties filed cross-motions for summary judgment and the district court granted one motion[] but denied the other." *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 47 (2d Cir. 2019) (per curiam); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). We similarly review the grant of a motion to compel arbitration *de novo*. *Katz v. Cellco P'ship*, 794 F.3d 341, 344 n.4 (2d Cir. 2015); *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997).

On appeal, the Union principally contends that (1) the district court lacked subject matter jurisdiction over the action because the dispute was docketed by the NMB and the issues raise a representation dispute within the

- 14 -

exclusive jurisdiction of the NMB; (2) Atlas's motion to compel is untimely because it was filed more than six months after the Union's April 20, 2016 letter stating that the Atlas grievance was not arbitrable; and (3) the issues raised in the dispute are not arbitrable. We discuss each argument in turn.

## I. Jurisdiction over the Dispute

The Union argues that the NMB has exclusive jurisdiction over the dispute, and therefore the district court lacks subject matter jurisdiction over the Employers' claim, because (1) the Union filed a mediation application that was docketed by the NMB and (2) the claim is a representation dispute. We discuss each issue in turn.

### A. Applicable Law

As noted, whether the parties must mediate before the NMB or submit their claims to binding arbitration depends on whether the dispute is a major, minor, or representation dispute. *See, e.g.*, *CSX Transp.*, 879 F.2d at 995-98; *Air Line Pilots Ass'n*, 656 F.2d at 20 n.6.

Major disputes relate to disputes involving the "formation of collective agreements or efforts to secure them." *CSX Transp.*, 879 F.2d at 995 (quoting *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945)). These types of

- 15 -

disputes arise "where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Id.* (internal quotation marks omitted). Carriers or unions may attempt to resolve a major dispute by providing thirty days' written notice "of an intended change in agreements affecting rates of pay, rules or working conditions" pursuant to Section 6 of the RLA. *Id*. at 996 (quoting 45 U.S.C. § 156). If the parties fail to reach an agreement via mandatory negotiations, either party may request mediation by the NMB. *Id.* Where the NMB "determines after mediation that the parties have reached an impasse, the NMB must 'endeavor . . . to induce the parties to submit their controversy to [consensual] arbitration.'" *Id.* (quoting 45 U.S.C. § 155). Absent voluntary arbitration, the parties must maintain the status quo and "cool off" for thirty days before resorting to economic self-help such as a strike by the union or unilateral changes to the terms and conditions of employment by the carrier. *Id.* Alternatively, the NMB may refer an unresolved major dispute of sufficient importance to the President for further proceedings, during which time the parties must maintain the status quo. *See id.*

Minor disputes refer to disputes involving existing collective bargaining agreements where the parties challenge "either . . . the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* at 995 (internal quotation marks omitted). "A dispute will be considered minor . . . if the contract is reasonably susceptible to the carrier's interpretation." *Id.* at 997 (internal quotation marks omitted). The carrier's burden is "relatively light" in this regard. *Id.* at 999; *accord Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 307 (1989).

After initial attempts to negotiate the resolution of a minor dispute, a party "may submit the dispute for resolution through *binding* arbitration to the National Railroad Adjustment Board ("NRAB") . . . or to other boards of adjustment upon which the parties agree." *CSX Transp.*, 879 F.2d at 997 (citations omitted). The resolution of minor disputes is within the exclusive jurisdiction of the appropriate adjustment board, and courts cannot adjudicate the merits of the dispute. *Id.* at 1003; *Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 37 (2d Cir. 1996) ("If a dispute is characterized as minor, a court cannot assert jurisdiction over the action nor can the parties seek judicial remedies such as an injunction."). Even though a district court is not authorized under the RLA

to resolve the merits of a minor dispute, including interpreting the terms of a collective bargaining agreement, it may compel arbitration of a minor dispute. *W. Airlines*, 480 U.S. at 1302.

"'Representation' disputes involve defining the bargaining unit and determining the employee representative for collective bargaining." *Id.* "Where a representation dispute appears on the face of the complaint, even in the absence of a challenge by a competing union or an application to the NMB, the court is bound to dismiss the action." *Air Line Pilots Ass'n*, 656 F.2d at 24; *accord W. Airlines*, 480 U.S. at 1302-03. To resolve a representation dispute, "[t]he NMB must, upon the request of either party, investigate the representation dispute and certify within 30 days the representative of the craft or class of employees in question." *Air Line Pilots Ass'n*, 656 F.2d at 20 n.6.

## B. Application

### 1. Docketing of Application

The Union argues that the NMB has exclusive jurisdiction over the parties' dispute simply because it docketed the Union's application for mediation. As we have explained, however, the NMB's jurisdiction over labor disputes turns on whether the parties' disagreement is a major, minor, or

representation dispute within the meaning of the RLA. Docketing is merely an administrative act, acknowledging the filing of a petition. *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 293 F. Supp. 3d 457, 468 n.14 (S.D.N.Y. 2018) ("Courts routinely 'docket' cases as an administrative matter before determining whether they have jurisdiction or not."). Moreover, the NMB did not address the merits of the Union's petition, nor did it determine whether the Union was raising a major, minor, or representation dispute. Hence, the NMB's docketing of the Union's mediation application by itself does not deprive the district court of subject matter jurisdiction. *See Air Line Pilots Ass'n*, 656 F.2d at 24; *In re Am. Train Dispatchers Ass'n*, 43 N.M.B. 71, 82 (Feb. 23, 2016) (dismissing action for lack of jurisdiction after assigning docket number); *In Re N.C. State Ports Auth. & N.C. Ports Ry. Comm'n*, 9 N.M.B. 398, 409-10 (June 8, 1982) (same); *cf. Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it.").

## 2.     *Type of Dispute*

The NMB has jurisdiction over a case if it concerns a major dispute or a representation dispute.  *See W. Airlines*, 480 U.S. at 1302-03; *CSX Transp.*, 879 F.2d at 996.  The instant case does not.

As a preliminary matter, the management grievances do not involve a major dispute.  The parties are subject to existing, albeit amendable, collective bargaining agreements that govern the pay, rules, and working conditions of the Atlas and Southern pilots.  The disputes here relate to whether the Union is in violation of those collective bargaining agreements by refusing to negotiate a JCBA.  *Bhd. of Maint. of Way Employes Div. v. Burlington N. Santa Fe Ry. Co.*, 596 F.3d 1217, 1222-23 (10th Cir. 2010) ("The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing agreement" and "[t]he essence of the inquiry is whether the source of a party's asserted legal right is its collective bargaining agreement." (quoting *Consol. Rail Corp.*, 491 U.S. at 305)).

On its face, the Atlas CBA is "reasonably susceptible to [Atlas's] interpretation" that the announcement of an operational merger between Atlas and Southern triggered Section 1.F. and Section 1.B of the collective bargaining

agreements. *CSX Transp.*, 879 F.2d at 997 (internal quotation marks omitted). Both agreements contain language governing the negotiation of a JCBA following certain conditions such as a decision to complete an operational merger with an affiliated air carrier or notification of an intent to integrate seniority lists. Both collective bargaining agreements then establish adjustment boards with mandatory jurisdiction over all disputes concerning the interpretation or application of *any* terms of those agreements. J. App'x at 24 (Section 21); *id.* at 34 (Section 19(D)(2)). In turn, Atlas and Southern's management grievances question whether the existing merger provisions of their collective bargaining agreements have been triggered by the decision to join Atlas and Southern, and whether the Union is in violation of the agreements.

In contrast, the Union's refusal to arbitrate the Atlas grievance is based on its view that "Company" in the Atlas CBA refers only to Atlas and Polar, and that by virtue of a prior arbitrator's decision to exclude AAWH from the scope provisions of the Atlas CBA, AAWH is not bound by the Atlas CBA. As pleaded, the Employers' argument that the Union violated Section 1 of the collective bargaining agreements and is subject to binding arbitration is "plausible" or at least "not obviously insubstantial," and the district court was

- 21 -

under no obligation to "weigh[] and decide who has the better of the argument." *CSX Transp.*, 879 F.2d at 999; *see also Consol. Rail Corp.*, 491 U.S. at 305 ("To an extent, then, the distinction between major and minor disputes is a matter of pleading" and "[t]he party who initiates a dispute takes the first step toward categorizing the dispute when it chooses whether to assert an existing contractual right to take."). Such contract interpretation issues are the hallmark of a minor dispute and thus subject to mandatory resolution by the appropriate adjustment boards. *See Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.*, 399 F.3d 89, 99 (1st Cir. 2005) ("[I]f a dispute involves two reasonable but competing interpretations of the parties' rights under a CBA, the dispute is not major."). Accordingly, the management grievances involve a minor dispute, and the district court did not err in exercising jurisdiction over the Employers' motion to compel arbitration of the management grievances.

The Union also frames the dispute as a representation dispute concerning whether Atlas and Polar or Atlas and Southern constitute a single carrier for representation purposes. The Union, however, already represents both Atlas and Southern pilots, and the collective bargaining agreements between them contemplate the parties' obligations when a merger occurs

- 22 -

between carriers represented by the same union. *See Guilford Transp. Indus.*, 399 F.3d at 105 n.11 (recognizing that union did not raise representation dispute within exclusive jurisdiction of NMB because union had not asserted right to represent employees not covered by collective bargaining agreement); *Ass'n of Flight Attendants v. United Airlines, Inc.*, 71 F.3d 915, 919 (D.C. Cir. 1995) (holding controversy did not concern a representation dispute in case where "both groups of employees are represented by the [union] so there is no question as to the identity of the exclusive representative"); *CSX Transp.*, 879 F.2d at 996 ("It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous" (quoting *Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 33-34 (2d Cir. 1962)). In these circumstances, we reject the Union's argument that the case raises issues of representation that would fall within the exclusive jurisdiction of the NMB.

## II. *Statute of Limitations*

The Union also argues that the Atlas grievance -- but not the Southern one -- is barred because Atlas's February 7, 2017 motion to compel arbitration was untimely. J. App'x at 134-35. We disagree.

- 23 -

## A. Applicable Law

The statute of limitations applicable to a motion to compel arbitration under the RLA is an open question in this Circuit. The text of the RLA does not prescribe a statute of limitations for such a motion. "When a federal statute fails to specify a limitations period," we typically look to state law for "the most analogous period" to apply. *Robinson v. Pan Am. World Airways, Inc.*, 777 F.2d 84, 86 (2d Cir. 1985) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983)). Where the statute concerns substantive matters of federal labor law, however, we have held that the state limitations period may give way to a limitations period borrowed from comparable federal statutes. *Id.*; *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 241 (2d Cir. 1984).

Courts have applied the six-month limitations period for unfair labor practice claims under Section 10(b) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 160(b), to other claims between unions and employers governed by comparable labor law statutes. *See, e.g., DelCostello*, 462 U.S. at 168-72 (applying NLRA's six-month limitations period to Labor Management Relations Act ("LMRA") claims). We have also looked to the NLRA to determine the limitations period applicable to other labor law claims arising under the RLA.

*See Robinson*, 777 F.2d at 88 (applying NLRA's six-month limitations period to claim for wrongful discharge under RLA). Moreover, we have held that "the six-month statute of limitations under Section 10(b) of the [NLRA] applies to actions to compel a labor arbitration" under the LMRA. *Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington*, 820 F.2d 31, 37 (2d Cir. 1987).

In *Harrington*, we determined that the six-month limitations period should be applied to motions to compel arbitration of disputes under the LMRA because of the need for: (1) "prompt resolution of grievances;" (2) "'proper balance between the national interests in stable bargaining relationships and finality of private settlements,' . . . and a party's interest in invoking the arbitral process under the collective bargaining system;" and (3) uniformity of statutes of limitations for grievances involving conduct that may also constitute an unfair labor practice under the NLRA. *Id.* at 37 (internal citation omitted). These same considerations apply to the transportation industries and therefore to motions to compel arbitration under the RLA. Accordingly, as the parties agree, we now hold that motions to compel arbitration of disputes governed by the RLA are subject to a six-month statute of limitations.

The next question is when a cause of action to compel arbitration accrues. As we have recognized, "it is well established that a cause of action to compel arbitration accrues when a party unequivocally refuses a demand to arbitrate." *Id.* at 38; *accord Schweizer Aircraft Corp. v. Local 1752, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 29 F.3d 83, 87 (2d Cir. 1994). Equivocality turns on the factual circumstances in each case. *Diamond D Const. Corp. v. Int'l Union of Operating Eng'rs, Local Unions No. 17, 17A, 17B, 17C & 17R*, 15 F. Supp. 2d 274, 289 (W.D.N.Y. 1998) ("[T]he particular circumstances of each case control the 'unequivocal refusal' inquiry.").

At minimum, a flat refusal to arbitrate without further inquiry or discussion of the dispute is sufficiently unequivocal. *See Schweizer*, 29 F.3d at 87. In *Schweizer*, we considered the union's counterclaim, filed one month after employer's petition to stay the arbitration, to be timely because it was the employer's "only unequivocal refusal to arbitrate." *Id.* Importantly, there was no mention of any attempt to resolve the underlying dispute from the time of the union's demand for arbitration, made February 2, 1993, to the date that the employer filed the petition to stay arbitration, February 19, 1993. *Id.* at 84-87. Similarly, in *Communications Workers of America v. Western Electric Company*, there

was no discussion of intervening activity amongst the parties that followed the employer's "immediate, blunt, and to the point" replies that it considered its dispute with the union "non-arbitrable." 860 F.2d 1137, 1145 (1st Cir. 1988) (hereinafter "*CWA*"). Accordingly, the First Circuit concluded in that case that the statement was an unequivocal refusal to arbitrate that commenced the statute of limitations. *Id.*

By contrast, non-responses or equivocal statements do not cause the statute of limitations to run. *See I.B.E.W. Sys. Council U-7 v. N.Y. State Elec. & Gas Corp.*, 180 F.3d 368, 370 (2d Cir. 1999) (per curiam) (holding that there was no unequivocal refusal to arbitrate where party "simply announced the status of the arbitration proceeding," and nothing indicated that it would refuse to arbitrate if asked); *Local Joint Exec. Bd. of Las Vegas, Bartenders Union Local 165, Culinary Workers' Local Union No. 226 v. Exber, Inc.*, 994 F.2d 674, 676 (9th Cir. 1993) (holding that constructive notice of refusal to arbitrate was insufficient, and "[b]ecause the Union never received from the employer an unequivocal, express refusal of its demand to arbitrate, the statute of limitations never commenced running"); *Aluminum Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp.*, 991 F.2d 1545, 1548 (11th Cir. 1993) (holding that the motion to compel

arbitration was timely because the employer's statements that "I'm sure you will agree that the matter is closed" and "I . . . would be interested to see what the Union's position is" were equivocal).

In certain cases, whether a party has made an unequivocal refusal to arbitrate has not been clear; and at least one court has questioned whether mere formalities, such as a petition to stay arbitration, or an initial refusal to arbitrate absent "[u]nambiguous conduct" to the same effect, "rise to the level of an unequivocal refusal" to arbitrate. *Diamond*, 15 F. Supp. 2d at 289. The district courts in our circuit have not resolved this question uniformly. *Compare id.* ("[T]his court believes that the unequivocal refusal standard does not turn on whether the party resisting arbitration has filed a petition to stay arbitration or has uttered the magic words 'we refuse to arbitrate this dispute.'"), *with Raymond v. Mid-Bronx Haulage Corp.*, No. 15-cv-5803, 2017 WL 9882601, at *3 (S.D.N.Y. June 10, 2017) ("To the contrary, courts require 'clear' and 'express' conduct, such as a motion to stay arbitration procedures or an explicit objection to arbitration proceedings, before finding an unequivocal refusal to arbitrate."), *and Hotel Greystone Corp. v. N.Y Hotel & Motel Trades Council*, 902 F. Supp. 482, 485 (S.D.N.Y. 1995) (holding motion to stay arbitration, and not earlier letter

objecting to arbitrator's reconsideration of the award, was unequivocal refusal to arbitrate because hotel continued to contest jurisdiction and merits and participated in hearing before arbitrator).

When a party's refusal to arbitrate does not fall neatly into the equivocal or unequivocal classifications, some courts have resolved the inquiry by evaluating the parties' conduct following the refusing party's initial communication. *See Teamsters Local Union No. 783 v. Anheuser-Busch, Inc.*, 626 F.3d 256, 259-60 (6th Cir. 2010); *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 485 (6th Cir. 2006); *Fed'n of Westinghouse Indep. Salaried Unions v. Westinghouse Elec. Corp.*, 736 F.2d 896, 898-99 (3d Cir. 1984). We agree that in some circumstances a party's initial refusal to arbitrate can be rendered equivocal by the parties' subsequent statements and actions.

For example, in *Westinghouse*, the Third Circuit remanded the case for the district court to resolve whether a company's earlier statement that "[t]his dispute is not subject to demand arbitration and the Company is unwilling to process the grievance into arbitration by special agreement" was rendered equivocal by its subsequent statement that, "[w]hile [it] continue[d] to believe that the dispute [was] not arbitrable . . . , it would be willing to proceed to

arbitration by mutual agreement in this particular case, providing there is agreement as to the matter to be decided by an arbitrator." 736 F.2d at 898-99 (first alteration in original). In some circumstances, then, a party resisting arbitration does not meet the standard of unequivocal refusal where an initial, express refusal is followed by statements expressing some willingness to arbitrate.

Likewise, the Sixth Circuit concluded that an employer had not unequivocally refused to arbitrate where it stated that it was "'surprised' that the Union was still pursuing the grievance because [it] assumed that the Union had dropped the matter," the grievance was "not arbitrable," and the union should provide legal authority for its position. *Cummins*, 434 F.3d at 483. The court reasoned that while the employer initially stated that the grievance was not arbitrable, "its subsequent conduct . . . suggested that it was still open to negotiating" and the letter "stat[ing] the grievance was not arbitrable without requesting further information from the Union . . . [wa]s the date when [the employer's] refusal to arbitrate became unequivocal." *Id.* at 485; *see also Teamsters Local Union No. 783*, 626 F.3d at 259-60 (holding that "[a] statement that a grievance is not arbitrable, which simultaneously requests additional

information, does not amount to an unequivocal position that the employer will not arbitrate," and union's claim was not time-barred where employer's communications sought additional information but lacked indication that "negotiation or settlement was not feasible").  We agree that notwithstanding an initial refusal to arbitrate, a party's refusal to arbitrate can be rendered equivocal by conduct showing that it is willing to negotiate the merits or arbitrability of the underlying dispute.

## B.    *Application*

The Employers' February 2017 motion to compel arbitration is timely because the Union's initial refusal to arbitrate was rendered equivocal by its subsequent participation in negotiations with Atlas to create a JCBA or to arbitrate the dispute.

To begin with, the parties contest whether the Union's April 20, 2016 letter, which claimed that the management grievance was "facially invalid" and "not arbitrable,"  J. App'x at 134-35, constituted an unequivocal refusal to arbitrate.  There is some ambiguity, as the Union stated that the Employers' grievances were invalid and not arbitrable at the same time it noted that it was "look[ing] forward to an amicable resolution of [the] dispute through consensual

negotiations." *Id.* at 135. The Union's indication that it was open to consensual negotiations arguably softened its position that the Atlas grievance was not arbitrable. As in *Teamsters Local Union No. 783*, there was no clear signal that "negotiation or settlement" of the issue in dispute "was not feasible." 626 F.3d at 260. A statement of the Union's view on arbitrability followed by an invitation to negotiate the merits of the dispute could reasonably be construed as a statement of its initial position rather than an unequivocal refusal to arbitrate. *See Aluminum Brick*, 991 F.2d at 1548.

We need not decide, however, the close question of whether the April 20 letter constituted an unequivocal refusal to arbitrate. Assuming, without deciding, that it did, the Union's participation in ensuing efforts to resolve the dispute rendered its initial refusal equivocal. For example, on May 20, 2016, the parties met to discuss, *inter alia*, interest arbitration. The Union indicated that it would consider Atlas's proposal to narrow the scope of arbitration, and in exchange, "[Atlas] temporarily deferred pursuing arbitration on the management grievance pending a response from the IBT." J. App'x at 78. Thus, as in *Westinghouse*, Atlas's restraint in pursuing its management grievance was predicated on the Union's willingness to arbitrate at least some issues,

including displacing the scope clause and negotiating a JCBA -- the very issues that Atlas sought to resolve by way of its management grievance.

Later, in the LOA proposed on July 14, 2016, IBT suggested a suspension, tolling, or deferral of the dispute relating to the Atlas grievance. Until the breakdown in negotiations, the parties continued to indicate a willingness to resolve the dispute by coming to terms on a JCBA while the Atlas grievance remained pending. Both the Union and Atlas thus recognized that negotiating a JCBA would moot the issues that formed the basis of the Atlas grievance.

IBT engaged in negotiations and discussions that, if successful, would have obviated the need for arbitration. Indeed, these discussions included the possibility of arbitration in the event the negotiations and discussions were not successful. Moreover, throughout the discussions, Atlas consistently reserved all rights (as did IBT). As the Third Circuit held in *Cummins*, we agree that "the employer must essentially determine that negotiation or persuasion is not feasible before the statute of limitations will begin to run." 434 F.3d at 484. Atlas did not make that determination until negotiations stalled in February 2017, and then it promptly filed this action.

Finally, we note that one of the principal purposes of the RLA is "to encourage use of the *nonjudicial* processes of negotiation, mediation and arbitration for the adjustment of labor disputes." *Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1079 (9th Cir. 2015) (quoting *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R. R.*, 321 U.S. 50, 58 (1944)). By filing its motion to compel only after it became clear that the Union's refusal to arbitrate was unequivocal, Atlas acted in accordance with the spirit of the RLA. Accordingly, we agree with the district court that Atlas's motion to compel arbitration of its management grievance was timely.

## III. *Arbitrability of the Employers' Grievances*

Finally, the Union raises three arguments with respect to the arbitrability of the Employers' management grievances: (1) the Southern CBA does not permit the employer to file a grievance that could be the basis of arbitration; (2) the Atlas grievance is not arbitrable because AAWH, and not the Company, initiated the merger so that the obligation to negotiate a JCBA has not been triggered; and (3) the adjustment board of one air carrier cannot exercise authority over the pilots of the other.

### A.    *Applicable Law*

Arbitrability concerns "whether a particular dispute is to be arbitrated under the terms of the contract."  *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019).  Courts must decide whether a collective bargaining agreement requires the parties to arbitrate a grievance unless the agreement provides otherwise.  *AT & T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 649 (1986) ("Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." (internal quotation marks omitted)); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) ("[F]ederal law does not require parties to arbitrate when they have not agreed to do so." (internal quotation marks omitted)).  Determining arbitrability, however, does not permit courts to address the merits of the underlying claims.  *AT & T*, 475 U.S. at 650.

### B.    *Application*

The Union's three arguments as to the arbitrability of the Employers' management grievances fail.

First, Southern is permitted to unilaterally file a grievance with the Southern Board. While the Union argues that the Southern CBA only provides for grievances filed by the Union, that authorization is permissive in that the "Union may file" a grievance, J. App'x at 32, 34; the agreement does not expressly prohibit Southern from filing grievances, *cf. Bhd. of Maint.*, 596 F.3d at 1224 ("Contractual silence can be construed as a reservation to the employer of the right to act unilaterally." (internal quotation marks omitted)). In any event, the Southern CBA gives the Southern Board mandatory authority "over disputes growing out of grievances or out of the interpretation of application of any of the terms" of the agreement. J. App'x at 34. That provision governs subject matter, not parties. Moreover, the language of the Southern CBA echoes that of Section 204 of the RLA, which provides:

> [D]isputes between an employee or group of employees
> and a carrier or carriers by air growing out of
> grievances, or out of the interpretation or application of
> agreements concerning rates of pay, rules, or working
> conditions . . . may be referred by petition of the parties
> *or by either party* to an appropriate adjustment board.

45 U.S.C. § 184 (emphasis added). Therefore, under the Southern CBA and the RLA, Southern was entitled to file a management grievance with the Southern

- 36 -

Board regarding the interpretation of Section 1.B.3 of the collective bargaining agreement.

Second, the district court correctly determined that it lacked authority to decide whether the merger provisions of the Atlas CBA were prompted by the announced operational merger of Atlas and Southern. Unlike cases in which the district court must determine whether a party agreed to be bound by a collective bargaining agreement, here, the parties have removed that issue from the district court's consideration and placed it squarely before the Atlas Board -- the parties agreed that disputes over the interpretation or application of the collective bargaining agreements are to be decided by the boards of adjustment. *See Buscek*, 919 F.3d at 189-91. And whether Section 1.F of the Atlas CBA encompasses AAWH as a parent company, as the Employers argue, or only applies to the "Company" in reference to Atlas and Polar as a single air carrier, as the Union argues, is a question of contract interpretation that is at the heart of the Atlas grievance. Thus, the district court is not permitted to address the merits of the underlying claim. *AT & T*, 475 U.S. at 650.

Third, the Union contends that the parties' dispute is not arbitrable on the ground that it would require one employer's adjustment board to exercise

jurisdiction over the employees of the other employer. This argument is unpersuasive. Atlas and Southern each submitted a management grievance to their respective board of adjustments. Accordingly, the Atlas Board and the Southern Board must make two independent determinations as to whether the Union must negotiate a JCBA under Section 1.F of the Atlas CBA and Section 1.B of the Southern CBA. The Atlas Board will only decide whether the Atlas CBA requires Atlas pilots to negotiate a JCBA, and the Southern Board will only decide whether the Southern CBA requires Southern pilots to do so.[1] Nothing in the process of interpreting the provisions of the two collective bargaining agreements purports to bind Atlas or Southern pilots to the terms of another existing collective bargaining agreement. Therefore, the Union's third argument fails, and the dispute is arbitrable.

---

[1] We acknowledge that this framework could produce the strange result that one adjustment board finds that the relevant CBA requires negotiation of a JCBA, but the other finds the opposite. In that case, one group of pilots would be required to negotiate a JCBA with a non-existent counterparty. At this time, we need not decide the proper course of action should this outcome obtain, as it is not currently before this Court. We note, however, that the parties, both sophisticated and counseled, appear to have bargained for this possibility by including JCBA provisions in their original CBAs.

*CONCLUSION*

For the reasons set forth above, we **AFFIRM** the judgment of the

district court.

KEARSE, *Circuit Judge*, dissenting in part:

I respectfully dissent from so much of the majority's decision as rules that plaintiffs' motion to compel arbitration, under the collective bargaining agreement between defendants (collectively the "Union") and plaintiff Atlas Air, Inc. ("Atlas"), of the April 2016 management grievance filed by Atlas was timely. I agree with the majority that an action to compel arbitration of a dispute governed by the Railway Labor Act ("RLA") is subject to a statute of limitations of six months, and that that limitations period begins when the party sought to be compelled has unequivocally refused a demand to arbitrate, *see, e.g.*, *Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington*, 820 F.2d 31, 37-38 (2d Cir. 1987); that a party's apparently unequivocal refusal can properly be viewed as not unequivocal in light of its subsequent conduct or statements, *see, e.g.*, *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.*, 736 F.2d 896, 902 (3d Cir. 1984) ("*Westinghouse*"); and that determination of the date on which a party has communicated such a refusal unequivocally depends on the particular circumstances of the case, *see, e.g.*, *I.B.E.W. System Council U-7 v. New York State Electric & Gas Corp.*, 180 F.3d 368, 370 (2d Cir. 1999). I disagree with the majority's view that the Union's

April 20, 2016 refusal to accede to Atlas's arbitration demand was not unequivocal--or that it became equivocal.

On or about April 14, 2016, Atlas sent the Union its management grievance (the "Atlas Grievance"), complaining that, by refusing to engage in bargaining with respect to the integration of staff and operations following the merger of Atlas and Southern Air, Inc. ("Southern"), the Union had "violat[ed] Section 1.F.2.b.iii of the" collective bargaining agreement between Atlas and the Union. The Atlas Grievance demanded arbitration pursuant to the Atlas-Union collective bargaining agreement.

The Union responded to the Atlas Grievance in a two-page letter dated April 20, 2016 ("Union's April 20 Letter" or "Letter") by stating that as the rights of Southern employees were "inextricably related to the allegations relating to the Atlas Air, Inc. collective bargaining agreement"--to which the Southern employees were not party--"*the entire purported management grievance . . . is not arbitrable*." (Union April 20 Letter at 1 (emphases added).) After describing "another reason" that "[t]he purported grievance is invalid" (*id*. at 1-2), the Union Letter reiterated that "*[t]he purported grievance is . . . invalid and not arbitrable*" (*id*. at 2 (emphases added)). I view this as an arbitration refusal that was unequivocal.

2

In that Letter, the Union concluded by stating "we look forward to an amicable resolution of our dispute through *consensual* negotiations, as provided for under the RLA" (*id*. (emphasis added)). The majority--while declining to decide whether the Union's "April 20 letter constituted an unequivocal refusal to arbitrate," Majority Opinion *ante* at 32--says that the Union's concluding statement "arguably softened" the Union's "position that the Atlas grievance was *not arbitrable*" (*id*. (emphasis added)). I see no such softening. Unlike the *Westinghouse* case, relied on by the majority, in which that company, after originally refusing arbitration, stated that it, conditionally, "*would be willing to proceed to arbitration* by mutual agreement in this particular case," 736 F.2d at 899 (emphasis added), here the Union's stated willingness to resolve the dispute simply through "consensual negotiations" does not at all suggest a willingness to submit the dispute to a third entity for adjudication by that entity.

The majority concludes that "the Union's participation in ensuing efforts to resolve the dispute rendered its initial refusal equivocal," Majority Opinion *ante* at 32. Again I disagree. The efforts referred to by the majority are principally that "on May 20, 2016, the parties met to discuss, *inter alia, interest arbitration*" (*id*. (emphasis added)), and that in July 2016 the parties had a proposed letter of agreement that the

3

majority says "suggested a suspension, tolling, or deferral of the dispute relating to the Atlas grievance," *id*. at 33. I see nothing here to indicate that the Union had retreated from its stance that the Atlas Grievance was not arbitrable. First of all,

> "*[i]nterest arbitration*" involves referring a dispute to an arbitration panel in order for it to establish the terms and conditions of a *future* collective bargaining agreement. *It differs from the more typical grievance arbitration, which involves interpreting an existing employment contract to determine whether its conditions have been breached.*

*Mulvaney Mechanical, Inc. v. Sheet Metal Workers International Ass'n*, 288 F.3d 491, 494 (2d Cir. 2002) (emphases added), *vacated on other grounds*, 538 U.S. 918 (2003). The parties did indeed proceed to discuss interest arbitration, because they sought to enter into a future contract--one that would, unlike any existing agreement, cover the crew members of both Atlas (along with its affiliate "Polar") and Southern.

Further, the July 2016 "Proposed Letter of Agreement" ("LOA") to which the majority refers--and which was headed "DRAFT FOR DISCUSSION"--stated that "[t]he purpose of this *LOA* is *to establish a process to negotiate* a joint collective bargaining agreement ('JCBA') covering the Atlas, Polar and Southern Crewmembers" (emphases added). Atlas itself, in an August 12, 2016 letter to the Union, noted that both sides proposed to "require interest arbitration" "only . . . if the parties cannot reach agreement on the terms of a JCBA."

4

While the majority views this as the Union "engag[ing] in negotiations and discussions that, if successful, would have obviated the need for arbitration," Majority Opinion *ante* at 33, the issue as to whether a refusal to arbitrate was unequivocal is not whether the dispute could be resolved without arbitration. The reference to a "need" for arbitration seems to presume arbitration's availability--which the Union had steadfastly denied--and such a presumption of availability ignores the fundamental principle that the source of any obligation to arbitrate is a contract between the parties:

> [A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). The parties plainly were free to negotiate a new agreement that would include a requirement for arbitration of a grievance such as that asserted in Atlas's April 14 demand. But I cannot infer that a party's evincing willingness to negotiate for inclusion of an arbitration requirement in a new agreement amounts to a deviation from its prior insistence that there was no relevant authorization for arbitration in the existing agreement.

In sum, in my view the Union's April 20, 2016 Letter rejected Atlas's request for arbitration unequivocally, stating that the Atlas management grievance was "not arbitrable." The Union's statement that it was willing to resolve the Atlas dispute "through consensual negotiations" did not suggest a willingness to have the dispute adjudicated by an arbitrator. And the Union's participation in negotiations toward providing for arbitration in a new contract did not imply any alteration of its April 20, 2016 position that the Atlas Grievance was not arbitrable under the existing contract. I thus would conclude that the present action filed in February 2017, more than six months later, is untimely.